T.C. Memo. 2008-185

UNITED STATES TAX COURT

KATHLEEN SULLIVAN ALIOTO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14356-03.                    Filed July 31, 2008.

<u>Karen L. Hawkins</u>, for petitioner.

<u>Andrew R. Moore</u> and <u>Michael Melone</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined that petitioner did
not qualify for relief from joint and several liability pursuant
to section 6015[1] for 1995 and 1996.[2]  This case is before the

_____

     [1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

     [2]  In her petition, petitioner sought relief pursuant to
                                              (continued...)

Court on petitioner's motion to vacate order of dismissal, as supplemented, pursuant to Rule 162 and petitioner's motion for reconsideration. The Court will grant petitioner's motion to vacate order of dismissal, as supplemented, and will grant petitioner's motion for reconsideration. The issue for decision is whether petitioner is entitled to relief from joint and several liability pursuant to section 6015(f) for 1995 and 1996.

FINDINGS OF FACT

I. Procedural Background

Petitioner Kathleen Sullivan Alioto (Mrs. Alioto) and her husband Joe Alioto (Mayor Alioto)[3] filed joint Federal income tax returns for 1995 and 1996. Mayor Alioto died in January 1998. After his death Mrs. Alioto filed a request for section 6015 relief for 1995 and 1996. Respondent determined that Mrs. Alioto did not qualify for section 6015 relief for either year. Mrs. Alioto petitioned for section 6015 relief. For 1995 and 1996 Mrs. Alioto sought only section 6015(f) relief. No deficiency was asserted against Mayor Alioto and Mrs. Alioto for either year.

---

[2](...continued)
sec. 6015 for 1993, 1994, 1995, and 1996. Since the petition was filed, respondent has collected amounts (payments from the Estate of Joseph Alioto) that fully satisfied the liabilities for 1993 and 1994, and the parties agree that these years are no longer at issue in this case.

[3] From Jan. 8, 1968, through Jan. 8, 1976, petitioner's husband Joe Alioto served as mayor of San Francisco, California.

In <u>Alioto v. Commissioner</u>, T.C. Memo. 2006-199 (Alioto I),
we held that we lacked <u>jurisdiction</u> over the case at bar.  We
stated:

> The Tax Court is a court of limited jurisdiction.
> <u>Commissioner v. Ewing</u>, 439 F.3d 1009, 1012 (9th Cir.
> 2006), revg. 118 T.C. 494 (2002).  Whether this Court
> has jurisdiction is fundamental and may be raised by a
> party or on the Court's own motion.  <u>Ewing v.
> Commissioner</u>, 118 T.C. at 495; <u>Fernandez v.
> Commissioner</u>, 114 T.C. 324, 328 (2000).
>
> Recently, the Court held that we lack jurisdiction
> over "stand-alone" section 6015(f) cases (i.e., cases
> in which no deficiency has been asserted) such as the
> case at bar.  <u>Billings v. Commissioner</u>, 127 T.C. ___
> (2006).  Additionally, the U.S. Court of Appeals for
> the Ninth Circuit, the court to which appeal of this
> case apparently lies, also has held that the Tax Court
> lacks jurisdiction over "stand-alone" section 6015(f)
> cases (i.e., cases in which no deficiency has been
> asserted) such as the case at bar.  <u>Commissioner v.
> Ewing</u>, 439 F.3d at 1014-1015.
>
> Accordingly, pursuant to <u>Billings</u> and the opinion
> of the U.S. Court of Appeals for the Ninth Circuit's
> [sic] in <u>Ewing</u>, we conclude that we lack jurisdiction
> over this case.  <u>Billings v. Commissioner</u>, <u>supra</u>; <u>Toppi
> v. Commissioner</u>, T.C. Memo. 2006-182 (dismissing stand-
> alone section 6015(f) case for lack of jurisdiction
> pursuant to <u>Billings</u> because the Commissioner did not
> assert a deficiency for any of the years in issue);
> <u>Stroud v. Commissioner</u>, T.C. Memo. 2006-175 (same); see
> also <u>Commissioner v. Ewing</u>, 439 F.3d at 1014-1015;
> <u>Golsen v. Commissioner</u>, 54 T.C. 742 (1970), affd. 445
> F.2d 985 (10th Cir. 1971).  Therefore, we shall dismiss
> this case for lack of jurisdiction.

Accordingly, on September 18, 2006, the Court entered an order of
dismissal for lack of jurisdiction.

On October 18, 2006, the Court received petitioner's motion for reconsideration. On November 29, 2006, petitioner filed a motion for leave to file a motion to vacate order of dismissal and lodged a motion to vacate order of dismissal.

On December 12, 2006, the Court granted petitioner's motion for leave to file a motion to vacate order of dismissal and filed the motion to vacate order of dismissal, as supplemented, and the motion for reconsideration.

As of December 20, 2006, Mrs. Alioto's balances due for 1995 and 1996 were $153,501 and $1,832,010, respectively.

II. Substantive Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time she filed the petition, Mrs. Alioto resided in California.

In 1966 Mrs. Alioto received a B.A. in English literature from Manhattanville College of the Sacred Heart in Purchase, New York. That same year she began work as a third grade teacher in Bedford-Stuyvesant, New York, at an annual salary of $5,400.

For the next 3 years Mrs. Alioto worked as an elementary school teacher at P.S. 113 in Harlem, New York, at an annual salary of less than $6,000.

From 1971 to 1973 Mrs. Alioto taught emotionally disturbed children in an inner city neighborhood of Boston, Massachusetts.

In 1973 Mrs. Alioto was elected to the Boston Public School Board.  From 1974 to 1980 she served without pay as a member of the Boston Public School Board.  During this period Mrs. Alioto went back to school, and in 1980 she earned a Ph.D. in education.

Mayor Alioto and Mrs. Alioto married in February 1978.  At the time of their marriage Mayor Alioto was almost 30 years older than Mrs. Alioto (Mrs. Alioto was in her early thirties and Mayor Alioto was in his sixties).  They remained married until Mayor Alioto's death in January 1998 just before his 82d birthday.  Mayor Alioto and Mrs. Alioto had two children.  These two children were 18 and 16 years old at the time of Mayor Alioto's death.  Mayor Alioto and Mrs. Alioto enjoyed a loving, supportive, and harmonious marital relationship, and Mayor Alioto believed it was his absolute duty to care and provide for his family.

Before his marriage to Mrs. Alioto, Mayor Alioto was married for over 30 years to Angelina Alioto (Angelina).  Mayor Alioto and Angelina had six children.  This marriage ended in divorce.

In December 1978, shortly after marrying Mrs. Alioto, Mayor Alioto executed a marital settlement agreement (MSA) with Angelina.  In the MSA, among other things, Mayor Alioto obligated himself to indemnify and defend Angelina with respect to outstanding joint Federal and State tax liabilities for 1976 and

1977. Mrs. Alioto did not learn of the MSA until after Mayor Alioto's death.

From January 8, 1968, through January 8, 1976, Mayor Alioto served as the mayor of San Francisco, California. Mayor Alioto practiced law as an antitrust attorney for his entire legal career, which spanned over 50 years.

From 1980 to 1998 Mrs. Alioto served on various educational committees, but she was not paid for this service and did not earn income working outside her home. During this time Mrs. Alioto "attended to" Mayor Alioto, kept their home, and raised their children. Mayor Alioto did not want Mrs. Alioto to work outside the home during their marriage.

Mayor Alioto virtually never discussed finances or business matters with his children or with Mrs. Alioto--such discussions were rare. Mrs. Alioto was not involved with Mayor Alioto's law practice and had virtually no knowledge of his business dealings.

In April 1984 a residence at 2510 Pacific Avenue, San Francisco, California, was purchased as a home for Mayor Alioto and Mrs. Alioto (Mrs. Alioto's personal residence). Title to Mrs. Alioto's personal residence was in her name.

In 1990 and 1991, pursuant to stipulated decisions entered by the Tax Court, Mayor Alioto individually was assessed

additional income tax of $522,489 for 1976;[4] and Mayor Alioto and Angelina jointly were assessed additional income tax of $486,403 for 1977. When these "premarital"[5] (vis-a-vis Mrs. Alioto) liabilities were assessed, interest had accrued increasing the amounts due to $1,525,856.96 and $1,268,201.85 for 1976 and 1977, respectively.

Accountants at Kelly & Rossi prepared the couple's joint tax returns for each year Mayor Alioto was married to Mrs. Alioto. Mrs. Alioto never met with or spoke with anyone at Kelly & Rossi.

On October 15, 1996, Mayor Alioto and Mrs. Alioto filed a joint Federal income tax return for 1995 (1995 return). The 1995 return listed $40,249 in income tax, $13,394 in self-employment tax, $6,543 in household employment tax, an estimated tax penalty of $2,929, no estimated tax payments, and a total balance due of $63,115. Attached to the 1995 return was a letter dated October 15, 1996, on letterhead from the "Law Offices of Joseph L. Alioto", addressed to the Internal Revenue Service (IRS) and the Franchise Tax Board, regarding taxes due for 1995, signed by Mayor Alioto, stating:

---

[4] Mayor Alioto and Angelina, however, were jointly liable for this amount for 1976.

[5] We use the term "premarital" for convenience. The 1976 and 1977 tax liabilities are "premarital" as regards petitioner (i.e., they predate petitioner's marriage to Mayor Alioto).

I am enclosing my tax returns without payment of the tax, as I have impounded a recent fee of $2.1 million in the United States District Court for the Northern District of California, San Francisco Division (USDC Case No. C 96-2922 CAL) before the Honorable Judge Charles A. Legge requesting that the payment for these taxes be made from that source.

There are various claimants to the funds, including the IRS, and I am petitioning the court that that fee of $2.1 million be used in part to pay these taxes.

Mrs. Alioto did not see this letter when the 1995 return was filed. Although the 1995 return contains a signature for Mrs. Alioto, she did not sign the 1995 return. Mrs. Alioto and Mayor Alioto did not have any conversations regarding the 1995 return at the time it was filed, nor was she then aware that Mayor Alioto had filed the 1995 return on Mrs. Alioto's behalf.[6]

In December 1996 the IRS seized $2,026,153.35 which was community property, representing Mayor Alioto's entire fee (New England Patriots case fees) earned in 1996 for legal services rendered in the matter of Sullivan v. Natl. Football League (New England Patriots case). Mayor Alioto sought to have the IRS apply the seized New England Patriots case fees to satisfy Mayor Alioto's and Mrs. Alioto's liabilities for 1995 and 1996. A Form 8275, Disclosure Statement, attached to the 1996 return, states: "See attached letter to IRS attorney (Northern California

---

[6] The same is true for Mrs. Alioto's 1993 and 1994 tax years, no longer in issue. Petitioner, however, does not contend that the 1993, 1994, and 1995 returns were not joint returns because she did not sign them.

District).  Taxpayer takes the position that the 1996 tax is paid in full from the $2,100,000 fee earned in 1996 which the IRS subsequently impounded."  In the referenced attached letter Mayor Alioto wrote:  "that when the tax on the $2,100,000 becomes due (1996 return), that too should be paid from that source.  The equity of this position is inherent in the fact that the $2,100,000 represented community earnings of my wife Kathleen".  The letter further stated:  "It does not seem equitable or legal that Kathleen Alioto's community earnings should pay joint obligations of my former wife, particularly when the $2,100,000 fee was earned from a case involving Kathleen Alioto's family."[7]

In December 1996 the IRS served a levy regarding Mayor Alioto's 1976 "separate"[8] tax liability on Drug Barn to collect any legal fees owed to Mayor Alioto.  In May 1998, when the Drug Barn legal fee was awarded to Mayor Alioto, the IRS agreed to release a portion of the Drug Barn legal fee to pay the current year's tax that would be due on the income.

In January 1997 Mayor Alioto sent a letter to the U.S. Attorney's Office confirming that he had designated that the amount due on the 1995 return be paid from funds he "recently

_____

[7] Mrs. Alioto's father was a former owner of the New England Patriots.

[8] We use the term "separate" for convenience.  The 1976 and 1977 tax liabilities are "separate" as regards petitioner (i.e., they predate Mrs. Alioto's marriage to Mayor Alioto).

deposited with the court for the benefit of the I.R.S.".  Mayor Alioto noted that it would be inequitable for the United States to apply the balance of the New England Patriots case fees solely to his separate premarital tax debts when the New England Patriots case fees represented community property, and that an inequitable application of the New England Patriots case fees would leave a community property tax debt unpaid at the expense of Mrs. Alioto.  Mrs. Alioto did not see the letter at that time.

Between August 18 and October 3, 1997, David Miller (Mr. Miller), an estate planning lawyer, met with Mayor Alioto and Mrs. Alioto to discuss drafting an estate plan for each of them.  Mayor Alioto gave Mr. Miller a list of assets and their approximate values.  Mayor Alioto also disclosed to Mr. Miller $4 million in total debt.  Mr. Miller reasonably believed that at that time Mayor Alioto and Mrs. Alioto had a net worth of $16 million.

On October 15, 1997, Mayor Alioto and Mrs. Alioto filed a joint Federal income tax return for 1996 (1996 return).  The 1996 return listed $772,704 in income tax, $58,222 in self-employment tax, $6,532 in household employment tax, an estimated tax penalty of $853, an estimated tax payment of $838,311, and a total balance due of zero.  Before signing the 1996 return, Mayor Alioto showed it to Mrs. Alioto and asked whether she had any questions regarding it.  Mrs. Alioto reviewed the 1996 return,

and she saw the estimated tax payment of $838,311 and a total balance due of zero before she signed the return.

When Mrs. Alioto signed the 1996 return, she reasonably believed that any tax liability shown on the return had been paid. Mrs. Alioto knew that Mayor Alioto had earned the New England Patriots case fees, that Mayor Alioto had earned another $1 million fee in 1997, and that he was attorney of record in a number of other lawsuits in which he would earn additional income.

In 1997 Mayor Alioto gave Mrs. Alioto $500,000 to deposit in a brokerage account with Paine Webber. That same year, without Mrs. Alioto's knowledge or consent, Mayor Alioto withdrew over $110,000 from that brokerage account with Paine Webber. Mrs. Alioto did not discover until after Mayor Alioto's death that he had withdrawn the funds.

Mrs. Alioto reasonably believed that she and her husband had a high net worth and that Mayor Alioto earned a lot of money each and every year that they were married. Mayor Alioto's public and private personas--those of a highly successful lawyer with substantial earning capacity, a man of wealth, and a man who was on top of everything and who was in control--supported Mrs. Alioto's aforementioned reasonable belief.

In April 1998 administration of the Estate of Joseph Alioto (the estate) was commenced, and it is still pending in the San

Francisco Probate Court (the probate case).  Mrs. Alioto has served as sole special administrator, sole executrix, and sole trustee in the probate case.  Creditors, including the IRS and the California State Franchise Tax Board, filed claims of over $74 million against the estate.  The IRS's claim in the probate case, including the liabilities in dispute in this case, totaled $4,239,834.34.

Mrs. Alioto was shocked, surprised, and stunned to learn the amounts of the creditors' claims being asserted against the estate and that Mayor Alioto had used $18 million of their community property (income) to pay debts for others (including Angelina and his children from his marriage to Angelina) throughout her marriage to Mayor Alioto.  After learning the magnitude of the claims against the estate and how much of her community property had already been used to pay Mayor Alioto's separate debts (including those of Angelina and his children from his marriage to Angelina), Mrs. Alioto filed a creditor's claim in the probate proceeding for the amounts of her separate and community property that had already been used to pay Mayor Alioto's separate debts (including those of Angelina and his children from his marriage to Angelina).  None of her claim will be paid.

In June 1998 Mrs. Alioto, in her capacity as special administrator of the estate, recovered a legal fee due to Mayor

Alioto. The IRS seized $51,873 of this fee and applied it to Mayor Alioto's liability for 1976.

In July 1998 Mrs. Alioto secured employment as a consultant for Connell & Co. During 1998 Mrs. Alioto earned $50,000.

Mrs. Alioto's family health insurance terminated at the time of Mayor Alioto's death. During 1998 Mrs. Alioto incurred health care expenses for treating family members' grief and depression over Mayor Alioto's death. Additionally, Mrs. Alioto incurred expenses for treating her daughter's epilepsy. Mrs. Alioto reasonably estimated that she incurred medical expenses of approximately $22,000 in both 1998 and 1999.

In 1998 and 1999 Mrs. Alioto paid for her daughter's schooling, the taxes and maintenance on Mrs. Alioto's personal residence, Mayor Alioto's legal secretary to assist with the multitude of litigation matters that arose after his death, and expenses to look for employment.

On or about January 20, 1999, Mrs. Alioto filed a request for relief pursuant to section 6015 from joint and several liability for income taxes for 1995 and 1996. Mrs. Alioto admitted that relief pursuant to section 6015(b) or (c) is not available for 1995 or 1996, but Mrs. Alioto requested relief pursuant to section 6015(f) for 1995 and 1996. Appeals Officer Nelson Wong was assigned to consider Mrs. Alioto's request.

At the request of Appeals, from March 1999 to April 2000 Revenue Agent Theresa Martin investigated the merits of Mrs. Alioto's claim for section 6015 relief.  Ms. Martin was assigned to assess the claim, find the facts, apply the law, and make a determination.

Ms. Martin held three meetings with Mrs. Alioto's representative.  Mrs. Alioto's counsel turned over to the IRS all requested documents that she was able to obtain.  Additionally, Mrs. Alioto's counsel orally gave Ms. Martin the information that she requested when no documents were available.  It took Ms. Martin 3 days to review all the documentation that Mrs. Alioto and/or Mrs. Alioto's counsel provided her.

When Ms. Martin met with Mrs. Alioto's counsel, Ms. Martin was alerted to the number of creditors who had filed claims against the estate and the amounts of additional liabilities being discovered in Mayor Alioto's probate proceedings.  Mrs. Alioto's counsel explained to Ms. Martin Mrs. Alioto's fiduciary duties as trustee of the trust.  Mrs. Alioto's counsel further explained to Ms. Martin that the assets transferred into trusts were not Mrs. Alioto's personal assets.

Ms. Martin consulted with respondent's Collection Division regarding amounts to allow for basic living expenses.  Ms. Martin did not request a financial statement from Mrs. Alioto, and the Collection Division did not have one either.

On August 19, 1999, real property in Auburn, California, titled in Mrs. Alioto's name, was sold for $2.4 million. Pursuant to a lien on the property, the IRS received $1,841,197.39 from the sale of the real property in Auburn, California, and applied these proceeds to Mayor Alioto's separate liability for 1976.

By September 1999 the IRS applied $955,374.85 of the over $2 million of the New England Patriots case fees it had seized to the premarital (regarding Mrs. Alioto) 1977 tax liability of Mayor Alioto and Angelina, paying it in full. After satisfying the 1977 liability, around September 1999 the IRS applied the balance of the New England Patriots case fees, over $1 million, it seized to the premarital (regarding Mrs. Alioto) 1976 tax liability of Mayor Alioto. Mrs. Alioto's community property was used to relieve Angelina (Mayor Alioto's former spouse) of liability for 1976 and to pay Mayor Alioto's liability for 1977 while Mrs. Alioto remained liable for the joint community liability for 1995 and 1996.

During 1999 Mrs. Alioto worked for Connell & Co. and the San Francisco Unified School District. During 1999 she earned $179,000--$30,000 of which was a fee from the estate. For 1999 she paid $79,000 in taxes.

On October 26, 1999, the Court entered a stipulated decision, agreed to by Mrs. Alioto and respondent, in docket No.

3013-95 which ordered and decided that pursuant to section 6015(b) Mrs. Alioto was relieved, in full, of liability for deficiencies in income tax and section 6662 penalties for 1989, 1990, and 1991.

During 2000 Mrs. Alioto secured a position as a fundraiser for the City College of San Francisco (City College). She still was employed in that position, at will,[9] by City College as of the time of trial. In 2003 she earned $121,000. Mrs. Alioto received a 4-percent raise in 2004, but she received no raises before 2004 because of cutbacks. In order to have pension "rights" at City College, Mrs. Alioto would have to work for 10 years (until she was age 67).

In October 2000, pursuant to the probate court's oral instruction, Mrs. Alioto placed all the cash she held as trustee of the Alioto Living Trust[10] into a blocked account subject to probate court supervision. The probate court authorized Mrs. Alioto to use $405,000 to pay the trust's Federal and State 2000 income taxes.

---

[9] Mrs. Alioto could lose this job at any time--especially if the chancellor or trustees of City College (who are elected every 2 years) change.

[10] On Oct. 3, 1997, the Alioto Living Trust document was executed.

During 2001 and 2002 Mrs. Alioto or her counsel provided respondent's Appeals Office copies of pleadings filed in the probate court and information about the probate proceedings.

During 2002 the probate referee made a final recommendation that Mrs. Alioto's personal residence was community property. The probate judge decided that Mrs. Alioto's personal residence was to be sold to pay Mayor Alioto's creditors. Respondent's Appeals Office was advised of the aforementioned decisions. In January 2003 the Appeals officer assigned to Mrs. Alioto's case inserted into the administrative record a newspaper article that reported that Mrs. Alioto was being forced to sell her personal residence in order to pay Mayor Alioto's debts.

On May 29, 2003, respondent determined that Mrs. Alioto was not entitled to relief pursuant to section 6015(f) for 1995 or 1996.

In September 2003, pursuant to an order from the probate court, Mrs. Alioto's personal residence was sold for $6.6 million. On October 29, 2003, pursuant to additional orders from the probate court, the following amounts were paid to creditors of the estate:

| Creditor | Amount |
|----------|--------|
| IRS | $175,968.06 |
| Angelina | 325,945.21 |
| Fred Furth | 571,884.95 |
| Alioto Fish Co. | 276,657.53 |
| Franchise Tax Board | 2,585,756.61 |
| City National Bank | 1,036,526.40 |
| Total | 4,972,738.76 |

The balance of the proceeds (approximately $1.6 million) is on deposit with the probate court.  As of November 1, 2003, the total accrued tax liability for 1995 and 1996 was $1,558,221.54.  As of November 30, 2003, outstanding creditors' claims against Mayor Alioto's estate included:[11]

| Creditor | Amount |
|----------|--------|
| IRS | $5,236,067.90 |
| Franchise Tax Board | 876,564.54 |
| Fred Furth | 125,248.00 |
| Angelina | 579,966.00 |
| Richard Schwartz | 210,000.00 |
| Maxwell Keith | 42,500.00 |
| Arlene Harris | 92,000.00 |
| Pacific Bank | 551,226.45 |
| Total | 7,713,572.89 |

Between 1994 and 1999 respondent collected $4,685,444.47 from the community income and assets of Mrs. Alioto and Mayor Alioto.  Respondent applied the entire $4,685,444.47 collected to Mayor Alioto's separate, premarital tax liabilities for 1976 and 1977.  During the process of collecting Mayor Alioto's 1976 and 1977 tax liabilities and Mayor Alioto's and Mrs. Alioto's joint

---

[11]  Not including the IRS, the amount of outstanding creditors' claims as of Nov. 30, 2003, totaled $2,477,504.99.

tax liabilities, respondent's collection officers did not have any direct contact with Mrs. Alioto.

There are no unpaid tax liabilities due from Mrs. Alioto regarding her timely filed tax returns for 1997 through 2002. As of the date of trial, Mrs. Alioto had approximately $7,000 in a savings account and $99,000 deposited in retirement plans and did not own a car. The Social Security Administration estimated her benefits will be $600 per month. In June 2008 Mrs. Alioto turned 64 years old.

                           OPINION

I.  Jurisdiction and Motion To Vacate

Whether this Court has jurisdiction is fundamental and may be raised by a party or on the Court's own motion. Fernandez v. Commissioner, 114 T.C. 324, 328 (2000). In petitioner's motion to vacate our order of dismissal and responses thereto, petitioner and respondent agree that pursuant to the Tax Relief and Health Care Act of 2006 (TRHCA), Pub. L. 109-432, div. C, sec. 408, 120 Stat. 3061, the Tax Court now has jurisdiction over the case at bar. The fact that the parties agree that the Court has jurisdiction over these issues is not sufficient to provide us with such jurisdiction; the Court still must determine that Congress has granted us jurisdiction. See Evans Publg., Inc. v. Commissioner, 119 T.C. 242, 247 n.5 (2002).

TRHCA, div. C, sec. 408, amended the Tax Court's section 6015 jurisdiction.  TRHCA provided the Tax Court with jurisdiction over "stand-alone" section 6015(f) cases where the liability for the taxes arose or remained unpaid on or after the date of the enactment of TRHCA (i.e., December 20, 2006).  Id.

As of December 20, 2006, Mrs. Alioto's income taxes for 1995 and 1996 remained unpaid.  Accordingly, the Court has jurisdiction to determine whether Mrs. Alioto is entitled to section 6015(f) relief for 1995 and 1996.  Therefore we shall grant Mrs. Alioto's motion to vacate order of dismissal, as supplemented.

II.  Motion for Reconsideration

Respondent objects to the motion for reconsideration as "the court's opinion in this case [Alioto I] correctly interpreted and applied section 6015(f) and applicable case law to this case when the opinion in this case was issued."  We agree that the Court correctly applied the caselaw as it existed at the time the Court issued Alioto I; however, we disagree that the motion for reconsideration should be denied.[12]  After the Court's decision in Alioto I the law and the Court's jurisdiction changed.

---

[12] The granting of a motion for reconsideration rests within the discretion of the Court, and we will not grant a motion for reconsideration unless the party seeking reconsideration shows unusual circumstances or substantial error. See, e.g., Alexander v. Commissioner, 95 T.C. 467, 469 (1990), affd. without published opinion sub nom. Stell v. Commissioner, 999 F.2d 544 (9th Cir. 1993).

Pursuant to section 6015 as amended by TRHCA, on the facts of the case at bar the Court has jurisdiction to determine whether Mrs. Alioto is entitled to section 6015(f) relief for 1995 and 1996. Accordingly, we shall grant Mrs. Alioto's motion for reconsideration.

III.  Scope of Review

Respondent argues that when the Court determines whether Mrs. Alioto is entitled to section 6015(f) relief for 1995 and 1996, the Court is limited to the administrative record and may not consider evidence introduced at trial that was not included in the administrative record.  We disagree.

In Ewing v. Commissioner, 122 T.C. 32 (2004) (Ewing II),[13] vacated 439 F.3d 1009 (9th Cir. 2006) (Ewing III), the Court held that our determination of whether a taxpayer is entitled to section 6015(f) relief is made in a trial de novo and the Court may consider evidence and matters at trial which were not included in the administrative record.  In Ewing III, the U.S. Court of Appeals for the Ninth Circuit--the court to which appeal of this case lies--vacated Ewing II for lack of jurisdiction but did not address our holding as to the scope of review.  Ewing

_____

[13]  In "Ewing I", Ewing v. Commissioner, 118 T.C. 494 (2002), revd. 439 F.3d 1009 (9th Cir. 2006), we held that the Court had jurisdiction to determine whether equitable relief was available to taxpayer for underpayment of tax shown on joint return (i.e., over "stand-alone" sec. 6015(f) cases).

III, supra at 1015 ("In light of our conclusion that the Tax Court did not have jurisdiction over Ewing's petition, we vacate the Tax Court decision in Ewing II, 122 T.C. 32, addressing the scope of review by the Tax Court"), id. n.6 ("Because we conclude that the Tax Court lacked jurisdiction, we decline to address the other issues [i.e., the scope of review] raised in the Commissioner's appeal."), vacating Ewing II and revg. 118 T.C. 494 (2002).

In Porter v. Commissioner, 130 T.C. __ (2008), we recently addressed the aforementioned issue of the scope of our review in section 6015(f) cases. For the reasons stated in Porter and Ewing II, when the Court determines whether a taxpayer is entitled to section 6015(f) relief the Court's determination is made in a trial de novo and the Court is not limited to the administrative record; i.e., the Court may consider evidence and matters at trial which were not part of the administrative record.[14] Porter v. Commissioner, supra; Ewing II, supra.

IV. Section 6015(f) Relief

Section 6015(f) allows relief to a requesting spouse "if-- (1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable". The Commissioner

---

[14] We note that if we were limited to reviewing the administrative record, it is likely that the outcome in this case would be different.

applies Rev. Proc. 2000-15,[15] sec. 4.01, 2000-1 C.B. 447, 448, to determine whether to grant equitable relief.  See, e.g., Washington v. Commissioner, 120 T.C. 137, 147-152 (2003); Jonson v. Commissioner, 118 T.C. 106, 125-126 (2002), affd. 353 F.3d 1181 (10th Cir. 2003); Nihiser v. Commissioner, T.C. Memo. 2008-135.

Rev. Proc. 2000-15, sec. 4.01 has seven general requirements that all requesting spouses must meet for relief pursuant to section 6015(f).  Respondent concedes that Mrs. Alioto meets the guidelines for relief set forth in Rev. Proc. 2000-15, sec. 4.01(1)-(7).

A.  Safe Harbor:  Rev. Proc. 2000-15, Sec. 4.02

Revenue Procedure 2000-15, supra, also has a safe harbor whereby the IRS ordinarily will grant relief pursuant to section 6015(f) (safe harbor).  Nihiser v. Commissioner, supra; Gonce v. Commissioner, T.C. Memo. 2007-328 (discussing identical provisions in Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. 296, 298); Billings v. Commissioner, T.C. Memo. 2007-234 ("The procedure also has a safe harbor--three conditions that, if met,

---

[15] Rev. Proc. 2000-15, 2000-1 C.B. 447, has been superseded by Rev. Proc. 2003-61, 2003-2 C.B. 296.  The new revenue procedure applies only to requests for relief filed on or after Nov. 1, 2003, or those pending on Nov. 1, 2003, for which no preliminary determination letter has been issued as of that date. Id. sec. 7, 2003-2 C.B. at 299.  In May 2003 respondent determined Mrs. Alioto was not eligible for sec. 6015 relief. Accordingly, we apply Rev. Proc. 2000-15, supra, to this case.

will ordinarily trigger a grant of relief."); Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448 (titled "Circumstances under which equitable relief under § 6015(f) will ordinarily be granted"). The safe harbor grants relief to a requesting spouse if the requesting spouse meets three conditions.[16]  Nihiser v. Commissioner, supra; see Rev. Proc. 2000-15, sec. 4.02.

1.  First Safe Harbor Condition

The first safe harbor condition is:

> At the time relief is requested, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse, or has not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date relief was requested;

Rev. Proc. 2000-15, sec. 4.02(1)(a).  Mayor Alioto died in January 1998.  Accordingly, we conclude that Mrs. Alioto satisfied the first safe harbor condition.

---

[16]  Relief that the Commissioner ordinarily grants pursuant Rev. Proc. 2000-15, sec. 4.02(1), 2000-1 C.B. at 448, is subject to the limitations set forth in Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448--(a) if the return is or has been adjusted to reflect an understatement of tax, relief will be available only to the extent of the liability shown on the return before any such adjustment; and (b) relief will only be available to the extent that the unpaid liability is allocable to the nonrequesting spouse.  Respondent did not address Rev. Proc. 2000-15, sec. 4.02(2), on brief.  Accordingly, we deem that respondent has waived any issue regarding Rev. Proc. 2000-15, sec. 4.02(2).  See Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Levert v. Commissioner, T.C. Memo. 1989-333, affd. without published opinion 956 F.2d 264 (5th Cir. 1992).

2. Second Safe Harbor Condition

The second safe harbor condition is:

At the time the return was signed, the requesting spouse had no knowledge or reason to know that the tax would not be paid. The requesting spouse must establish that it was reasonable for the requesting spouse to believe that the nonrequesting spouse would pay the reported liability. If a requesting spouse would otherwise qualify for relief under this section, except for the fact that the requesting spouse had no knowledge or reason to know of only a portion of the unpaid liability, then the requesting spouse may be granted relief only to the extent that the liability is attributable to such portion; * * *

Id. sec. 4.02(1)(b). This factor is satisfied if the taxpayer reasonably believed when the return was filed that the liability would be paid by the taxpayer's spouse. See Van Arsdalen v. Commissioner, T.C. Memo. 2007-48 (the taxpayer reasonably believed taxes owed would be paid by the spouse); Wiest v. Commissioner, T.C. Memo. 2003-91 (same).

Respondent argued that Mrs. Alioto would have seen or known about certain notices of Federal tax liens and levies that were filed on her community property. Respondent relies on the testimony of Revenue Officer Cheryl Matthews.

We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 84 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also Gallick v. Baltimore & O.R. Co., 372 U.S. 108, 114-115 (1963); Boehm v. Commissioner, 326 U.S. 287, 293

(1945); Wilmington Trust Co. v. Helvering, 316 U.S. 164, 167-168 (1942). We decide whether evidence is credible on the basis of objective facts, the reasonableness of the testimony, and the demeanor of the witness. Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Pinder v. United States, 330 F.2d 119, 124-125 (5th Cir. 1964); Concord Consumers Hous. Coop. v. Commissioner, 89 T.C. 105, 124 n.21 (1987). We have evaluated each witness's testimony by observing his or her candor, sincerity, and demeanor and by assigning weight to the elicited testimony. See Neonatology Associates, P.A. v. Commissioner, supra at 84.

We found Ms. Matthews's testimony to be general, vague, conclusory, and/or questionable in certain material respects. Under the circumstances presented here, we are not required to, and generally do not, rely on Ms. Matthews's testimony. See Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The Court need not accept at face value a witness's testimony that is otherwise questionable. See Archer v. Commissioner, 227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court dated Feb. 18, 1954; Weiss v. Commissioner, 221 F.2d 152, 156 (8th Cir.

1955), affg. T.C. Memo. 1954-51; <u>Schroeder v. Commissioner</u>, T.C. Memo. 1986-467.  This is so even when the testimony is uncontroverted if it is improbable, unreasonable, or questionable.  <u>Archer v. Commissioner</u>, <u>supra</u>; <u>Weiss v. Commissioner</u>, <u>supra</u>; see <u>Quock Ting v. United States</u>, <u>supra</u>.

We conclude the evidence that respondent relies on is not credible or probative and is insufficient to conclude that Mrs. Alioto saw or knew about any notices of liens or tax levies. Mrs. Alioto's testimony on this matter, however, was credible. Upon the basis of Mrs. Alioto's credible testimony, we find that Mrs. Alioto never saw or knew about any notices of liens or tax levies or any seizures of property until after Mayor Alioto's death.

Mrs. Alioto credibly testified that she did not learn about the tax liabilities in issue (for 1995 or 1996) until after Mayor Alioto's death and that she was not aware of Mayor Alioto's tax problems or any dispute with regard to the New England Patriots case fees when she signed the 1996 tax return.  Mrs. Alioto never met with or spoke with anyone at the accounting firm that prepared Mayor Alioto and Mrs. Alioto's joint tax returns for the years in issue (or for any year she was married to Mayor Alioto). Furthermore, we find Mrs. Alioto's beliefs regarding her financial well-being and solvency--until she learned otherwise after Mayor Alioto's death in 1998--to be credible.

Mrs. Alioto did not learn of the MSA Mayor Alioto had executed until after his death. At the time the 1995 and 1996 tax returns were filed, Mrs. Alioto did not know or have reason to know that Mayor Alioto had obligated himself to indemnify and defend Angelina with respect to Mayor Alioto and Angelina's outstanding joint Federal and State tax liabilities for 1976 and 1977.

The 1995 return, filed in October 1996 but which Mrs. Alioto did not sign and never discussed with Mayor Alioto, reported a total balance due of $63,115. At that time Mayor Alioto was due legal fees totaling approximately $2.1 million from the New England Patriots case. Mayor Alioto was involved in the New England Patriots case because the case involved Mrs. Alioto's family.

The 1996 return, filed in October 1997, reported a balance due of zero. Mrs. Alioto reviewed the 1996 return, and she saw an estimated tax payment of $838,311 and a total balance due of zero, before she signed it. When Mrs. Alioto signed the 1996 return, she reasonably believed that any tax liability shown on the 1996 return had been paid. Mrs. Alioto knew that Mayor Alioto had earned the New England Patriots case fees, that Mayor Alioto had earned another $1 million fee in 1997, and that Mayor Alioto had a number of other lawsuits that he was attorney of record for in which he would earn additional income. In fall

1997 Mrs. Alioto reasonably believed, on the basis of statements made by Mayor Alioto, that he had cases pending that would bring in more money than he had earned in his entire career.

During August through October 1997 Mayor Alioto and Mrs. Alioto met with an estate planning lawyer to discuss drafting an estate plan for each of them. Mayor Alioto gave the attorney a list of assets and liabilities and their approximate values. The attorney reasonably believed that at that time Mayor Alioto and Mrs. Alioto had a net worth of $16 million. Accordingly, we find that it was reasonable for Mrs. Alioto to believe that her net worth as of October 1997 was $16 million. Mrs. Alioto reasonably believed that she and her husband had a high net worth and that Mayor Alioto earned a lot of money every year that they were married.

In Gonce v. Commissioner, T.C. Memo. 2007-328, we held that the second criterion in Rev. Proc. 2000-15, sec. 4.02, that at the time the joint return was signed the requesting spouse had no knowledge or reason to know that the tax would not be paid and that it was reasonable to believe that the nonrequesting spouse would pay the liability, was not satisfied. In Gonce, the taxpayer and her husband reported underpayments on their 2000 and 2001 Federal tax returns, both of which were signed by the taxpayer, of $1,188 and $2,528, respectively. Id. When those returns were filed, the taxpayer knew that her husband always

bought on credit and that she and her husband spent more than they made. We concluded that the taxpayer did not show that it was reasonable to rely on her husband to pay the tax due for those years.

The facts in the case at bar are diametrically opposed to those in Gonce. Mrs. Alioto credibly testified that Mayor Alioto had paid off over $18 million in debts. Mrs. Alioto reasonably believed, when the returns for 1995 and 1996 were filed, that Mayor Alioto would continue to pay off any debts that he owed. During Mayor Alioto's negotiations with the IRS regarding the Aliotos' outstanding joint tax liabilities for 1995 and 1996, Mayor Alioto worked arduously to protect the well-being and financial interests of Mrs. Alioto. Furthermore, if Mrs. Alioto had seen the 1995 return in October 1996, showing a balance due, she would have expected Mayor Alioto to pay the liability in full as she thought Mayor Alioto paid all their taxes. Mrs. Alioto credibly testified that she did not recall ever being asked to sign a joint tax return with Mayor Alioto that reflected a balance due. Mrs. Alioto credibly testified that had she seen a balance due on any tax return, she would have expected Mayor Alioto to pay it on account of his history of paying off their obligations/debts and the debts of his son.

During the years in issue Mrs. Alioto reasonably believed that Mayor Alioto was a man of wealth, a man who was on top of

everything, and a man in control. The credible evidence establishes that Mayor Alioto believed it was his absolute duty to care and provide for his family. From 1980 to 1998 Mrs. Alioto cared for Mayor Alioto and raised their children. During this time Mayor Alioto did not want Mrs. Alioto to work outside the home. Furthermore, Mayor Alioto was in charge of the family finances and tax matters. Mrs. Alioto did not sign the 1995 return and was not aware that any tax was due for 1995 or 1996 until years later. These facts further support the conclusion that Mrs. Alioto did not know, or have reason to know, of the 1995 and 1996 underpayments. See Dowell v. Commissioner, T.C. Memo. 2007-326 (concluding that the taxpayer did not know, or have reason to know because: (1) The requesting spouse did not sign the return for the year in issue; (2) the requesting spouse was not aware that any tax was due for the year in issue until years later; and (3) the nonrequesting spouse handled all tax matters for the couple and did not inform the requesting spouse of financial matters).

Accordingly, we conclude that Mrs. Alioto satisfied the second safe harbor condition.

### 3. Third Safe Harbor Condition

The third safe harbor condition is:

The requesting spouse will suffer economic hardship if relief is not granted. For purposes of this section, the determination of whether a requesting spouse will suffer economic hardship will be made by the Commissioner or the Commissioner's delegate, and will be based on rules similar to those provided in § 301.6343-1(b)(4) of the Regulations on Procedure and Administration.

Rev. Proc. 2000-15, sec. 4.02(1)(c).

Generally, economic hardship exists if collection of the tax liability will cause the taxpayer to be unable to pay reasonable basic living expenses. Butner v. Commissioner, T.C. Memo. 2007-136. The ability to pay reasonable basic living expenses is determined by considering the following nonexclusive factors: (1) The taxpayer's age, employment status and history, ability to earn, and number of dependents; (2) an amount reasonably necessary for food, clothing, housing, medical expenses, transportation, current tax payments, and expenses necessary to the taxpayer's production of income; (3) the cost of living in the taxpayer's geographic area; (4) the amount of property available to satisfy the taxpayer's expenses; (5) any extraordinary circumstances; i.e., special education expenses, a medical catastrophe, or a natural disaster; and (6) any other factor bearing on economic hardship. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs.; see Gonce v. Commissioner, T.C. Memo. 2007-328; Van Arsdalen v. Commissioner, T.C. Memo. 2007-48.

These provisions envision consideration of a taxpayer's retirement needs where appropriate. <u>Van Arsdalen v. Commissioner</u>, <u>supra</u>.

In 1966 Mrs. Alioto received a B.A. in English literature from Manhattanville College of the Sacred Heart in Purchase, New York, and she began work as a third grade teacher in Bedford-Stuyvesant, New York, at an annual salary of $5,400. For the next 3 years Mrs. Alioto worked as an elementary school teacher at P.S. 113 in Harlem, New York. She was paid less than $6,000 per year for this job. From 1971 to 1973 Mrs. Alioto taught emotionally disturbed children in an inner city neighborhood of Boston, Massachusetts. In 1973 Mrs. Alioto was elected a member of the Boston Public School Board. From 1974 to 1980 she served without pay as a member of the Boston Public School Board. During this period Mrs. Alioto went back to school, and in 1980 she earned a Ph.D. in education. From 1980 to 1998 Mrs. Alioto cared for Mayor Alioto, raised their children, and did not work outside the home.

In April 1998 administration of the estate was commenced. Creditors, including the IRS and the California State Franchise Tax Board, filed claims in excess of $74 million against the estate. The claim filed by the IRS in the probate case, including the liabilities in dispute in this case, totaled $4,239,834.34. At that time, Mrs. Alioto was shocked, surprised,

and stunned to learn the amounts of the creditors' claims that were being asserted against the estate. After learning the magnitude of the claims against the estate and how much of her community property had already been used to pay Mayor Alioto's separate debts, Mrs. Alioto filed a creditor's claim in the probate proceeding. None of her claim will be paid.

When the IRS employee assigned to Mrs. Alioto's section 6015 case met with Mrs. Alioto's counsel, she was alerted to the number of creditors who had filed claims against the estate and the amounts of additional liabilities being discovered in Mayor Alioto's probate proceedings. Neither the IRS employee assigned to Mrs. Alioto's section 6015 case nor the Collection Division requested a financial statement from Mrs. Alioto.

During 2001 and 2002 Mrs. Alioto or her counsel provided respondent's Appeals Office copies of pleadings filed in the probate court and information about the probate proceedings. During 2002 the probate referee made a final recommendation that Mrs. Alioto's personal residence was community property. The probate judge decided that Mrs. Alioto's personal residence was to be sold to pay Mayor Alioto's creditors. Respondent's Appeals Office was advised of these decisions. Additionally, in January 2003 the Appeals officer assigned to Mrs. Alioto's case inserted into the administrative record a newspaper article that reported

that Mrs. Alioto was being forced to sell her personal residence in order to pay Mayor Alioto's debts.

During 1998, Mrs. Alioto earned $50,000. Mrs. Alioto's family health insurance terminated in 1998 (at the time of Mayor Alioto's death). During 1999, Mrs. Alioto earned $179,000-- $30,000 of which was a fee from the estate. For 1999, Mrs. Alioto paid $79,000 in taxes. Mrs. Alioto incurred medical expenses for treating, among other things, her daughter's epilepsy. Mrs. Alioto reasonably estimated that she incurred medical expenses of approximately $22,000 in both 1998 and 1999.

During 2000, Mrs. Alioto secured a position as a fundraiser for the City College of San Francisco (City College). She still was employed in that position by City College as of the time of trial. However, this position is a year-to-year job with no tenure--Mrs. Alioto could lose her job at any time, especially if the chancellor or trustees of City College (who are elected every 2 years) changed.

In 2003 Mrs. Alioto earned $121,000. Mrs. Alioto received a 4-percent raise in 2004, but she received no raises before 2004. To have pension "rights" at City College, Mrs. Alioto would have to work for 10 years (until she was age 67).

In December 2, 2004, respondent served on the Clerk of the San Francisco Superior Court, Bank of the West, Oakland, California, Mrs. Alioto, and her counsel separate notices of levy

with a total amount due of $1,628,235.48. The notices of levy indicated that $129,842.97 was for her 1995 tax year and that $1,498,392.51 was for her 1996 tax year.

As of the date of trial Mrs. Alioto had approximately $7,000 in a savings account and $99,000 deposited in retirement plans and did not own a car. The Social Security Administration estimated her benefits will be $600 per month. In June 2008 Mrs. Alioto turned 64 years old. As of December 20, 2006, Mrs. Alioto's balances due for 1995 and 1996 were $153,501 and $1,832,010, a very substantial sum given her financial situation. The liabilities in issue would cause Mrs. Alioto significant hardship, and she provided sufficient information to show her liabilities significantly exceeded her assets. See Farmer v. Commissioner, T.C. Memo. 2007-74.

Considering Mrs. Alioto's age, employment status and history, ability to earn, and number of dependents; the amounts reasonably necessary for food, clothing, housing, medical expenses, transportation, current tax payments, and expenses necessary to her production of income; the cost of living in her geographic area; and the amount of property available to satisfy her expenses, we find that she would suffer economic hardship because payment of the underlying liabilities would prevent her from paying reasonable basic living expenses. See sec. 301.6343-1(b)(4), Proced. & Admin. Regs.; see also Butner v.

<u>Commissioner</u>, T.C. Memo. 2007-136; <u>Farmer v. Commissioner</u>, <u>supra</u>. Accordingly, we conclude that Mrs. Alioto has satisfied the third safe harbor condition.

B. <u>Conclusion</u>

Mrs. Alioto satisfies the safe harbor conditions in Rev. Proc. 2000-15, sec. 4.02.  Accordingly, respondent's determination that Mrs. Alioto did not qualify for relief pursuant to section 6015(f) was an abuse of discretion; i.e., it was arbitrary, capricious, and without sound basis in law or fact.

To reflect the foregoing,

<u>An appropriate order and decision will be entered</u>.