INTERMOUNTAIN INSURANCE SERVICE OF VAIL, LIMITED
LIABILITY COMPANY, THOMAS A. DAVIES, TAX MATTERS
PARTNER, PETITIONER *v*. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT *

Docket No. 25868–06.            Filed May 6, 2010.

R filed a motion to vacate the Court's prior decision and a
motion to reconsider the Court's prior opinion. R's motions are
premised on the retroactive application of temporary regula-
tions issued after the Court issued its opinion and entered its
decision. *Held*: R's motions to reconsider and to vacate will be
denied.

*Steven R. Anderson*, for petitioner.
*Gary J. Merken*, for respondent.

SUPPLEMENTAL OPINION

WHERRY, *Judge*: We issued an opinion and entered our
decision in this case on September 1, 2009. Relying on
*Bakersfield Energy Partners, LP v. Commissioner*, 128 T.C.
207 (2007), affd. 568 F.3d 767 (9th Cir. 2009), we decided
that the adjustments made in respondent's final partnership
administrative adjustment (FPAA) on which this case is based
are barred by the general 3-year period of limitations in sec-
tion 6501(a). [1] See *Intermountain Ins. Serv. of Vail, LLC v.
Commissioner*, T.C. Memo. 2009–195. Respondent subse-
quently issued two temporary regulations, sections
301.6229(c)(2)–1T and 301.6501(e)–1T, Temporary Proced. &
Admin. Regs., 74 Fed. Reg. 49322–49323 (Sept. 28, 2009),

---

*This Opinion supplements our previously filed opinion in *Intermountain Ins. Serv. of Vail,
LLC v. Commissioner*, T.C. Memo. 2009–195.

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986,
as amended and in effect for the year at issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

211

and on the basis of the application of those temporary regulations to this case, filed motions to vacate our decision and to reconsider our opinion.[2] The sole issue now before the Court is whether the temporary regulations compel us to grant respondent's motions.

## *Background*

The transactions at the heart of this case took place in 1999 and were reported on the 1999 Form 1065, U.S. Partnership Return of Income, of Intermountain Insurance Service of Vail, LLC (Intermountain), filed on September 15, 2000. The details of the transactions are largely irrelevant to the issues we face today. Suffice it to say that in the previously mentioned FPAA that respondent issued on September 14, 2006, respondent determined that the transactions characterized as a tax shelter "were a sham, lacked economic substance and * * * [had] a principal purpose of * * * [reducing] substantially the present value of * * * [Intermountain's] partners' aggregate federal tax liability". Critically, respondent's determination revolved around Intermountain's alleged overstatement of partnership basis.

Petitioner timely petitioned this Court for review of the FPAA and moved for summary judgment on the ground that respondent had issued the FPAA beyond the general 3-year

---

[2] In our Sept. 1, 2009, opinion, we noted that, although respondent argued that sec. 6501(e)(1)(A) applied, his arguments suggested that he meant to cite sec. 6229(c)(2) instead. See *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, *supra* n.3. Sec. 6501(e)(1)(A) extends the 3-year period of limitations for assessing tax to 6 years from the due date or the date of the tax return, whichever is later. See sec. 6501(a). For tax attributable to a partnership item, the period of limitations remains open at least for 3 years after the date the partnership return was filed or 3 years after the last day, disregarding extensions, for filing the partnership return, whichever is later. See sec. 6229(a). Sec. 6229(c)(2) extends the sec. 6229(a) period. Although there is no period of limitations within which the Commissioner must issue an FPAA, partnership item adjustments made in an FPAA are time barred at the partner level if the FPAA is not issued within the applicable period of limitations for assessing tax against a partner attributable to partnership items. See generally *Curr-Spec Partners, L.P. v. Commissioner*, 579 F.3d 391 (5th Cir. 2009), affg. T.C. Memo. 2007–289; *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533, 534–535, 542 (2000).

Respondent has not provided support for his argument that sec. 6501(e)(1)(A) or sec. 301.6501(e)–1T, Temporary Proced. & Admin. Regs., 74 Fed. Reg. 49322–49323 (Sept. 28, 2009), applies to this case. Respondent has only addressed an omission from Intermountain's partnership return and time periods running from the filing of that return. Nevertheless, the parties refer to the temporary regulations in tandem. Respondent states in his motion to reconsider that "The temporary regulations apply to petitioner's 1999 tax year". For the purposes of this Opinion, and because sec. 6501(e)(1)(A) and sec. 301.6501(e)–1T, Temporary Proced. & Admin. Regs., *supra*, could affect the outcome of this case if a partner's period of limitations was still open when the FPAA was issued, we will follow the parties' lead and refer to the temporary regulations in tandem.

period of limitations for assessing tax against Intermountain's partners. See secs. 6229(a), 6501(a). Respondent conceded that the 3-year limitations period had expired but argued that an extended 6-year period of limitations applied instead as a result of Intermountain's basis overstatement.[3] See secs. 6229(c)(2), 6501(e)(1)(A). A dispute over the proper interpretation of sections 6229(c)(2) and 6501(e)(1)(A) ensued.

Generally, a 6-year limitations period is triggered when a taxpayer or partnership "omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return". Sec. 6501(e)(1)(A) (taxpayer); see sec. 6229(c)(2) (partnership). The focus of the parties' dispute was whether an overstatement of basis constitutes an omission from gross income for purposes of triggering a 6-year limitations period.

This was not an issue of first impression. In *Bakersfield Energy Partners, LP v. Commissioner*, *supra*, we held that a basis overstatement was not an omission from gross income for purposes of sections 6229(c)(2) and 6501(e)(1)(A). In reaching our conclusion, we applied the holding of *Colony, Inc. v. Commissioner*, 357 U.S. 28, 33 (1958), in which the Supreme Court was faced with identical language in section 6501(e)(1)(A)'s predecessor—section 275(c) of the Internal Revenue Code of 1939. See *Bakersfield Energy Partners, LP v. Commissioner*, *supra* at 215 ("We are unpersuaded by respondent's attempt to distinguish and diminish the Supreme Court's holding in *Colony, Inc. v. Commissioner*"). The Supreme Court's holding, as we described it, was "that the extended period of limitations applies to situations where specific income receipts have been 'left out' in the computation of gross income and not when an understatement of gross income resulted from an overstatement of basis." *Id.* at 213. The Supreme Court had reviewed the statute's legislative history and determined that Congress had not intended

---

[3] The bar of the period of limitations is an affirmative defense, and petitioner bore the burden of proof. See Rules 39, 142(a); see also *Highwood Partners v. Commissioner*, 133 T.C. 1, 9 (2009). Petitioner established a prima facie case that the general 3-year period of limitations had expired as of the date the FPAA was issued in this case, and respondent conceded as much. Accordingly, and because respondent never suggested any other reason why the period of limitations with respect to any partner remained open, the burden of going forward shifted to respondent to establish that there was a greater-than-25-percent omission of gross income on a partner's or the partnership's return. See *Highwood Partners v. Commissioner*, *supra* at 9; see also *Intermountain Ins. Serv. of Vail v. Commissioner, LLC*, *supra* n.2.

214 UNITED STATES TAX COURT REPORTS (211)

a basis overstatement to be an omission from gross income. See *Colony, Inc. v. Commissioner*, *supra* at 33, 36.

We adhered to our precedent in *Bakersfield Energy Partners, LP v. Commissioner*, *supra*, when we issued our September 1, 2009, opinion in this case. See *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, T.C. Memo. 2009–195. Accordingly, in our September 1, 2009, order and decision, we granted petitioner's motion for summary judgment and decided that the adjustments in respondent's FPAA were barred by the general 3-year limitations period. That was not the end of the matter, however.

On September 24, 2009, less than a month after our order and decision in this case, respondent and the Treasury Department issued temporary regulations under sections 6229(c)(2) and 6501(e)(1)(A). See secs. 301.6229(c)(2)–1T and 301.6501(e)–1T, Temporary Proced. & Admin. Regs., *supra*. These temporary regulations were simultaneously issued as proposed regulations. See sec. 7805(e). On September 28, 2009, notice was published and comments were sought for sections 301.6229(c)(2)–1 and 301.6501(e)–1, Proposed Proced. & Admin. Regs., see Notice of Proposed Rulemaking by Cross-Reference to Temporary Regulations, 74 Fed. Reg. 49354 (Sept. 28, 2009), and the temporary regulations were published in the Federal Register, see secs. 301.6229(c)(2)–1T and 301.6501(e)–1T, Temporary Proced. & Admin. Regs., *supra*.

The temporary regulations provide, in pertinent part, that "an understated amount of gross income resulting from an overstatement of unrecovered cost or other basis constitutes an omission from gross income for purposes of * * * [sections 6229(c)(2) and 6501(e)(1)(A)]." See secs. 301.6229(c)(2)–1T and 301.6501(e)–1T, Temporary Proced. & Admin. Regs., *supra*. The interpretation espoused by the temporary regulations runs contrary to the interpretation adopted by this Court in *Bakersfield Energy Partners, LP v. Commissioner*, 128 T.C. 207 (2007), and by the Courts of Appeals for the Ninth and Federal Circuits in *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767 (9th Cir. 2009),[4] and

[4] According to T.D. 9466, 2009–43 I.R.B. 551, 552, the temporary regulations are consistent with a suggestion by the U.S. Court of Appeals for the Ninth Circuit in *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767, 778 (9th Cir. 2009), affg. 128 T.C. 207 (2007), that ambiguity in the statutory language may make the statutes susceptible to reinterpretation through

*Salman Ranch Ltd. v. United States*, 573 F.3d 1362 (Fed. Cir. 2009), respectively. See T.D. 9466, 2009–43 I.R.B. 551, 552 ("The Treasury Department and the Internal Revenue Service disagree with these courts that the Supreme Court's reading of the predecessor to section 6501(e) in *Colony* applies to sections 6501(e)(1)(A) and 6229(c)(2).").

Bolstered by the temporary regulations, respondent, on October 16, 2009, lodged—and on November 25, 2009, was permitted to file—an otherwise late motion to vacate our September 1, 2009, decision and a motion to reconsider our September 1, 2009, opinion. As the moving party, respondent bears the burden of proving entitlement to relief. See *Kraasch v. Commissioner*, 70 T.C. 623, 626 (1978). Respondent urges us to reconsider the case, this time eschewing our prior precedent in favor of the temporary regulations. Petitioner counters that the temporary regulations are either inapplicable, invalid, or otherwise not entitled to deference. On November 25, 2009, we ordered the parties to file briefs. Pursuant to our order, the parties filed opening briefs on January 5, 2010. Petitioner and respondent filed reply briefs on January 27 and February 1, 2010, respectively.

## *Discussion*

### I. *Motions To Reconsider and To Vacate*

Motions to reconsider and to vacate are governed by Rules 161 and 162, respectively. Those rules establish filing deadlines but provide no guidance on when the Court should grant or deny such motions. In the absence of more specific guidance, we look to caselaw and the Federal Rules of Civil Procedure. See Rule 1(b).

The decision to grant motions to reconsider and to vacate lies within the discretion of the Court. *Estate of Quick v. Commissioner*, 110 T.C. 440, 441 (1998) (motion to reconsider); *Kun v. Commissioner*, T.C. Memo. 2004–273 (motion to vacate). Motions to reconsider are generally "intended to correct substantial errors of fact or law and allow the introduction of newly discovered evidence that the moving party could not have introduced by the exercise of

---

regulations. We address this *infra* note 24.

due diligence in the prior proceeding." *Knudsen v. Commissioner*, 131 T.C. 185, 185 (2008). "Reconsideration is not the appropriate forum for rehashing previously rejected legal arguments or tendering new legal theories to reach the end result desired by the moving party." *Estate of Quick v. Commissioner*, *supra* at 441–442. Motions to vacate are generally not granted absent a showing of unusual circumstances or substantial error, e.g., mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, or other reason justifying relief. See, e.g., Fed. R. Civ. P. 60(b); *Brannon's of Shawnee, Inc. v. Commissioner*, 69 T.C. 999 (1978).

Importantly, an intervening change in the law can warrant the granting of both a motion to reconsider and a motion to vacate. See *Alioto v. Commissioner*, T.C. Memo. 2008–185.[5] In *Alioto v. Commissioner*, T.C. Memo. 2006–199, the Court held that it lacked jurisdiction over "stand-alone" section 6015(f) cases. After Congress expanded the Court's jurisdiction to include such cases, see Tax Relief and Health Care Act of 2006, Pub. L. 109–432, div. C, sec. 408, 120 Stat. 3061, the taxpayer filed timely motions to reconsider and to vacate, which the Court granted. See *Alioto v. Commissioner*, T.C. Memo. 2008–185 ("We agree that the Court correctly applied the caselaw as it existed at the time the Court issued Alioto I; however, we disagree that the motion for reconsideration should be denied. After the Court's decision in Alioto I the law and the Court's jurisdiction changed." (Fn. ref. omitted.)).

Respondent asks us to grant the motion to vacate in the "interests of justice" so that we "may grant the motion for reconsideration." Citing *Alioto v. Commissioner*, T.C. Memo. 2008–185, respondent further asserts that the issuance of the temporary regulations was an "unusual circumstance" warranting reconsideration of our September 1, 2009, opinion. Petitioner disagrees and attempts to distinguish *Alioto v. Commissioner*, T.C. Memo. 2008–185, noting that it involved "an act of [C]ongress * * *, not a regulation issued by Respondent, who was a litigant in the case." Along these lines, petitioner warns that "Granting Respondent's Motion under the circumstances of this case would give Respondent

---

[5] See also *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000); *Cornell v. Nix*, 119 F.3d 1329, 1332–1333 (8th Cir. 1997); *Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir. 1986); *McGrath v. Potash*, 199 F.2d 166, 167 (D.C. Cir. 1952).

license to render litigation futile" because "In every case where * * * [respondent] receives an adverse decision, Respondent could simply restate its [sic] unsuccessful argument as a temporary regulation, and then request reconsideration based upon the temporary regulation."

Petitioner's concerns are noteworthy;[6] however, they do not persuade us to deny respondent's motions without first considering the applicability and potential impact of the temporary regulations. Ignoring the temporary regulations at this time would not dispel the evils envisioned by petitioner. Indeed, respondent could appeal our September 1, 2009, decision and ask the appellate court to consider the issue of the temporary regulations in the first instance. Respondent has already done so in more than one case.[7] By neglecting the temporary regulations at this time we would not be protecting the integrity of the judicial system, as petitioner suggests, but merely failing to fully complete our work. We see no compelling reason to wield our discretion to that end. Moreover, we question petitioner's attempt to distinguish *Alioto v. Commissioner*, T.C. Memo. 2008–185, in this context.[8]

Accordingly, we proceed to consider the applicability and potential impact of the temporary regulations to this case. If, as petitioner contends, the temporary regulations do not apply, are invalid, or are otherwise not entitled to deference, we will deny respondent's motions because it would be pointless to grant them. If, on the other hand, the temporary regulations apply, are valid, and are entitled to deference, we would be required to ascertain whether, after considering all other factors, respondent's motions should be granted. We turn first to whether the temporary regulations apply to this case.

---

[6] Tax litigation is expensive, and respondent litigates with taxpayer-provided funds while petitioner and/or the limited liability company or its members must litigate with their own funds. If the law is allowed to change retroactively after a taxpayer has prevailed in one or more courts, thereby rendering their victory Pyrrhic, the perverse result will be to significantly discourage taxpayers from asserting their rights under the then-existing law.

[7] See Brief for the Appellant at 14, *Salman Ranch, Ltd. v. Commissioner*, No. 09–9015 (10th Cir., Feb. 16, 2010); Brief for the Petitioner at 17–18, *Commissioner v. M.I.T.A.*, No. 09–60827 (5th Cir., Mar. 3, 2010).

[8] See, e.g., *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744 n.3 (1996), which we cited in our Nov. 25, 2009, order in this case granting respondent's Oct. 16, 2009, motions for leave to file out of time the motions to reconsider and to vacate.

II. *The Applicability of the Temporary Regulations*

The threshold issue in determining whether the temporary regulations apply to this case is whether the temporary regulations apply by their own terms. The "Effective/applicability date" provisions of the temporary regulations provide that "The rules of this section apply to taxable years with respect to which the applicable period for assessing tax did not expire before September 24, 2009." Secs. 301.6229(c)(2)–1T(b) and 301.6501(e)–1T(b), Temporary Proced. & Admin. Regs., *supra*.

The starting point for interpreting a regulatory provision is its plain meaning. See *Walker Stone Co. v. Secy. of Labor*, 156 F.3d 1076, 1080 (10th Cir. 1998) ("When the meaning of a regulatory provision is clear on its face, the regulation must be enforced in accordance with its plain meaning."). We concluded in our September 1, 2009, opinion that the general 3-year limitations period of section 6501(a) was the applicable period for assessing tax in this case and that it had expired some time before September 14, 2006. The plain meaning of the effective/applicability date provisions indicates that the temporary regulations do not apply to this case.

Respondent argues to the contrary and in doing so begs the question[9] by advancing a notably convoluted interpretation of the effective/applicability date provisions:

To determine whether the temporary regulations are applicable under the effective date provision, the Court must determine whether a six-year statute of limitations would be open for the taxable year at issue, as of September 24, 2009, without regard to what the standard for applying the statute of limitations might be. If the six-year limitations period could be open under some standard as of September 24, 2009, then the temporary regulations apply.

Under respondent's interpretation, the Court must depart from our precedent in *Bakersfield Energy Partners, LP v. Commissioner*, 128 T.C. 207 (2007), affd. 568 F.3d 767 (9th

---

[9] See IRS Chief Counsel Notice CC–2010–001 (Nov. 23, 2009) stating:

The temporary regulations apply to taxable years with respect to which the applicable period of limitations for assessing tax did not expire before September 24, 2009. Accordingly, the temporary regulations apply to any docketed Tax Court case in which the period of limitations under sections 6229(c)(2) and 6501(e)(1)(A), as interpreted in the temporary regulations, did not expire with respect to the tax year at issue, before September 24, 2009, and in which no final decision has been entered.

Cir. 2009), which held that a 3-year limitations period applies under the circumstances of this case. We must then launch a quest for some hypothetical standard that could trigger a 6-year limitations period. If we discover such a standard—and the temporary regulations conveniently supply us with one—then we must apply that standard to determine whether the period of limitations in this case could have been open as of September 24, 2009. If the limitations period could have been open under the hypothetical standard, then the temporary regulations apply to this case.

Essentially, the key, according to respondent, is not whether the limitations period was actually open on September 24, 2009, under then-applicable law but whether the limitations period could have been open on that date under hypothetical law. Distilled even further, respondent's rationale suggests that the temporary regulations apply to this case because their application would trigger a 6-year limitations period. Respondent had phrased this argument more simply in his motion to reconsider: "The temporary regulations apply to petitioner's 1999 tax year, because the period of limitations under sections 6229(c)(2) and 6501(e)(1)(A), *as interpreted in the regulations*, remains open with respect to that year." (Emphasis added.)[10]

Ordinarily, an agency's interpretation of its own regulation is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted).[11] Here, however, the Court concludes that respondent's interpretation of the temporary regulations' effective/applicability date provisions is erroneous and inconsistent with the regulations. Specifically, we find the interpretation to be irreparably marred by circular, result-driven logic and the wishful notion that the temporary regulations should apply to this case because Intermountain was involved in what he believes was an abusive tax transaction. For these reasons, we refuse to accord respondent's interpretation deferential treatment.

---

[10] See *supra* note 9.

[11] See also *Ariz. Pub. Serv. Co. v. U.S. EPA*, 562 F.3d 1116, 1123 n.5 (10th Cir. 2009); *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823 (8th Cir. 2009); *Estate of Focardi v. Commissioner*, T.C. Memo. 2006–56 ("Our view is further supported by the well-established principle that the judiciary should accord substantial deference to the Commissioner's interpretation of Treasury regulations").

The plain meaning of the temporary regulations' effective/ applicability date provisions indicates that the temporary regulations do not apply to this case because the applicable period of limitations expired before September 24, 2009.[12] It would therefore be futile to grant respondent's motions to reconsider and to vacate, both of which are premised on the application of the temporary regulations to this case. While the foregoing establishes a plausible ground to rule against respondent's motions, it becomes compelling when combined with our discussion below.[13]

III. *Judicial Deference*

We next turn to whether the temporary regulations, if applicable, deserve judicial deference. Courts have long held that Federal tax regulations are entitled to some degree of deference. This is in recognition of the fact that "Congress has delegated to the [Secretary of the Treasury and his delegate, the] Commissioner [of Internal Revenue], not to the courts, the task of prescribing all needful rules and regulations for the enforcement of the Internal Revenue Code." *Natl. Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 477 (1979) (internal quotation marks omitted). Yet, the exact amount of deference owed to Federal tax regulations remains a source of debate.

Petitioner asserts that the temporary regulations are only entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), because they are interpretive regulations. Respondent counters that the more deferential

---

[12] The Court recognizes that respondent may argue that the decisions we rely upon, *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767 (9th Cir. 2009), and *Salman Ranch Ltd. v. United States*, 573 F.3d 1362 (Fed. Cir. 2009), holding that the limitations period had expired before Sept. 24, 2009, do not, in his opinion, make it so. There are 11 other Courts of Appeals and the Supreme Court still to be heard from, and by accepting as settled law the *Bakersfield* and *Salman Ranch* results our rationale may, in respondent's view, also beg the question. Respondent, however, cites no court authorities equivalent to those of the appellate court decisions, and although he cites the temporary regulations, courts have traditionally determined the meaning of statutes. See *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984) (stating that "The judiciary is the final authority on issues of statutory construction"). Thus we believe our position is appropriate. We address in section III below why in addition to *Bakersfield Energy Partners, LP v. Commissioner*, *supra*, and *Salman Ranch Ltd. v. United States*, *supra*, we conclude that the 3-year limitations period applied to this case before Sept. 24, 2009.

[13] We also recognize that respondent could amend the temporary regulations' effective/applicability date provisions and file renewed motions to reconsider and to vacate based on those amended provisions, thereby extending this dispute to yet another case. See *Murrell v. Shalala*, 43 F.3d 1388, 1389 (10th Cir. 1994).

standard in *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842–843 (1984), applies and that, if not, then the temporary regulations at least fall under *Natl. Muffler Dealers Association, Inc.* We need not resolve the parties' dispute on this issue because, even if the temporary regulations are entitled to review under *Chevron*, they face a formidable obstacle to deference—*Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958). [14]

The temporary regulations were not issued on a blank slate. In its 1958 opinion in *Colony, Inc.*, the Supreme Court interpreted the same statutory language and held that a basis overstatement was not an omission from gross income. *Id.* More than 50 years later, respondent and the Treasury Department issued the temporary regulations and reached the opposite conclusion. The question is whether we are bound by the agency's construction of the statute in the temporary regulations or by the Supreme Court's prior determination of congressional intent and the Internal Revenue Code's requirements, as set forth in *Colony, Inc.* Assuming respondent is correct that the temporary regulations are entitled to *Chevron* deference, the answer to this question lies in *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

"A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* In so holding, the Supreme Court reasoned as follows:

[14] Respondent maintains that *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), does not control the interpretation of secs. 6229(c)(2) and 6501(e)(1)(A), see T.D. 9466, *supra*, and that, in any event, the Supreme Court's and respondent's constructions are not necessarily inconsistent. We held otherwise in *Bakersfield Energy Partners, LP v. Commissioner*, 128 T.C. 207 (2007), and in our Sept. 1, 2009, opinion in this case. See *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, T.C. Memo. 2009–195. We rejected respondent's arguments in the process, and rehashing them now even in this context is not necessary. See *Estate of Quick v. Commissioner*, 110 T.C. 440, 441 (1998). As we noted previously, we are hesitant to contradict the Supreme Court's ruling in *Colony*. See *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, *supra* n.5. The Supreme Court has advised lower courts that "If a precedent of this Court [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the * * * [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson / Am. Express, Inc.*, 490 U.S. 477, 484 (1989). We rule that our analysis here of the legislative history behind the *Colony* decision provides further, and we believe determinative, support for those opinions.

[A]llowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute * * * would allow a court's interpretation to override an agency's. *Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps. * * * The better rule is to hold judicial interpretations contained in precedents to the same demanding Chevron step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction. [*Id.* at 982–983. [15]]

We are therefore directed to apply *Chevron* step one by determining whether the Supreme Court in *Colony, Inc. v. Commissioner*, *supra*, found the statutory provision at issue to be unambiguous. If so, there is no gap left for the temporary regulations to fill with respect to the statutory provisions at issue here. The first step in *Chevron's* two-step analysis is to ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, *supra* at 842. "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." [16] *Id.* at 842–843.

When determining Congress' intent, *Chevron* instructs us to employ "traditional tools of statutory construction." *Id.* at 843 n.9. Many courts, including the Courts of Appeals to which this case might be appealed, [17] have accepted the use of legislative history as an important element in *Chevron*

---

[15] In a concurring opinion, Justice Stevens suggested that this holding "would not necessarily be applicable to a decision by this Court that would presumably remove any pre-existing ambiguity." *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. 967, 1003 (2005) (Stevens, J., concurring). Justice Stevens' suggestion has indeed sparked debate over the applicability of *Brand X*. Although that debate is still largely open, we note, without approval or disapproval, that the U.S. Court of Appeals for the Tenth Circuit has held that *Brand X* does apply when the prior judicial construction is the Supreme Court's. See *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1248 (10th Cir. 2008) ("[W]e conclude that the holding of *Brand X* applies whether the judicial precedent at issue is that of a lower court or the Supreme Court.").

[16] The second step of *Chevron* specifies as follows:

If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. [*Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. at 843; fn. refs. omitted.]

[17] In our Sept. 1, 2009, opinion, we indicated that, absent stipulation to the contrary, this case may be appealable to the Court of Appeals for the Eighth, Tenth, or D.C. Circuit. See *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, T.C. Memo. 2009–195 n.4 (citing *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971)). We did not answer the question of proper venue and do not do so now. *Id.*

step one. See, e.g., *Anderson v. U.S. Dept. of Labor*, 422 F.3d 1155, 1180 (10th Cir. 2005) ("To determine whether Congress had an intent on the precise question at issue, courts utilize the traditional tools of statutory construction, including the statutory language and legislative history."). [18]

Therefore, in determining whether the Supreme Court in *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), found the statutory provision at issue to be unambiguous, we will consider the Court's analysis of both the statutory language and its legislative history. [19] Respondent calls attention to the Supreme Court's statement that "Although we are inclined to think that the statute on its face lends itself more plausibly to the taxpayer's interpretation, it cannot be said that the language is unambiguous." [20] *Colony, Inc. v. Commissioner*, *supra* at 33. In doing so, respondent ignores the Supreme Court's subsequent review of, and reliance on, the statute's legislative history. Although the Supreme Court initially found the statutory provision ambiguous, that was only a preliminary conclusion before considering the statute's legislative history. After thoroughly reviewing the legislative history, [21] the Supreme Court concluded that Congress' intent

---

[18] See *Catawba County v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009) ("To be sure, a statute may foreclose an agency's preferred interpretation despite such textual ambiguities if its structure, legislative history, or purpose makes clear what its text leaves opaque."); *North Dakota ex rel. Olson v. Ctrs. for Medicare & Medicaid Servs.*, 403 F.3d 537, 539–540 (8th Cir. 2005); see also *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1273 (11th Cir. 2009); *New York v. U.S. Dept. of Health & Human Servs.' Admin. for Children & Families*, 556 F.3d 90, 97 (2d Cir. 2009); *Natural Res. Def. Council v. U.S. EPA*, 526 F.3d 591, 603 (9th Cir. 2008); *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359–1360 (Fed. Cir. 2007); *Succar v. Ashcroft*, 394 F.3d 8, 22–23 (1st Cir. 2005). But see *United States v. Geiser*, 527 F.3d 288, 292 (3d Cir. 2008); *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998).

The Supreme Court has sent mixed signals about the use of legislative history in *Chevron* step one. In *Chevron* itself, the Court considered legislative history as part of step one. *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. at 862. It has continued to do so in more recent opinions, and we deduce that it intends to continue this practice. See *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 587–590, 600 (2004); see also *Zuni Pub. Sch. Dist. No. 89 v. Dept. of Educ.*, 550 U.S. 81, 90–91 (2007). Nevertheless, on occasion, the Court has stopped short of employing traditional tools of statutory construction, including legislative history. See *Negusie v. Holder*, 555 U.S. ____, ____, 129 S. Ct. 1159, 1183 (2009) (Thomas, J., dissenting).

[19] Although we have found no opinion in which a court considered legislative history when applying *Brand X*, we see no reason why a court—if it considers legislative history when applying *Chevron* step one—would not also consider it when applying *Brand X*.

[20] Both parties also refer to the Supreme Court's observation that "the conclusion we reach is in harmony with the unambiguous language of § 6501(e)(1)(A) of the Internal Revenue Code of 1954." *Colony, Inc. v. Commissioner*, 357 U.S. at 37. We decline both parties' requests to attach meaning to that statement.

[21] Hearings Before the House Comm. on Ways and Means, 73d Cong., 2d Sess. 139, 149 (1934); H. Rept. 704, 73d Cong., 2d Sess. 35 (1934), 1939–1 C.B. (Part 2) 554, 580; S. Rept. 558, 73d Cong., 2d Sess. 43–44 (1934), 1939–1 C.B. (Part 2) 586, 619.

was clear and that the statutory provision was unambiguous. *Id.* at 33, 36.

Specifically, the Supreme Court found the legislative history to be "persuasive evidence that Congress was addressing itself to the specific situation where a taxpayer actually *omitted* some income receipt or accrual in his computation of gross income, and not more generally to errors in that computation arising from other causes." *Id.* at 33 (emphasis added). It further indicated that "this history shows to our satisfaction that the Congress intended an exception to the usual three-year statute of limitations only in the restricted type of situation already described [an omission of an item of gross income]." *Id.* at 36. "We think that in enacting § 275(c) Congress manifested no broader purpose than to give the Commissioner an additional two years to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage in detecting errors." *Id.*

In so holding, the Supreme Court found that the statute's legislative history clarified its otherwise ambiguous text and, as a result, explicated Congress' intent and the meaning of the statutory provision. Thus, the Supreme Court's opinion in *Colony, Inc. v. Commissioner*, *supra*, "unambiguously forecloses the agency's interpretation" of sections 6229(c)(2) and 6501(e)(1)(A) and displaces respondent's temporary regulations.[22] See *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 983. Consequently, the temporary regulations[23] are invalid and are not entitled to deferential treatment.[24]

---

[22] We recognize that *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), predated both *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, *supra*, and *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra*, so that the Supreme Court could not have been aware of the standards against which its opinion would be tested. We agree, however, with the U.S. Court of Appeals for the Fourth Circuit, which stated that "[w]e * * * do not hold that a court must say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency." *Fernandez v. Keisler*, 502 F.3d 337, 347 (4th Cir. 2007).

[23] See *supra* note 2; *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, T.C. Memo. 2009–195 n.3.

[24] Respondent suggests that the U.S. Court of Appeals for the Ninth Circuit, in *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767 (9th Cir. 2009), invited respondent to issue the temporary regulations. The Court of Appeals acknowledged that the Supreme Court in *Colony, Inc. v. Commissioner*, *supra*, found sec. 275(c) to be ambiguous and stated that "The IRS may have the authority to promulgate a reasonable reinterpretation of an ambiguous provision of the tax code, even if its interpretation runs contrary to the Supreme Court's 'opinion as to the best reading' of the provision." *Bakersfield Energy Partners, LP v. Commissioner*, *supra* at

IV. *Retroactivity*

We next turn to petitioner's concern that the temporary regulations would have an impermissible retroactive effect if we applied them in this case. Respondent attempts to defuse petitioner's concern by arguing that the temporary regulations "are not retroactive as applied in this case" but that, even if they were, they would be permissibly retroactive. Thus, two issues emerge: First, whether the temporary regulations would have a retroactive effect if applied in this case, and second, if so, whether the retroactive effect would be permissible. However, in the light of our holdings above regarding the regulations' effective date and their validity, we need not answer these questions to resolve respondent's motions in this case. We therefore leave them for another day.

### *Conclusion*

In the light of the above holdings, we find it unnecessary to address petitioner's other concerns with respect to the temporary regulations. The Court has considered all of respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

*An appropriate order will be issued.*

Reviewed by the Court.

COLVIN, WELLS, VASQUEZ, GOEKE, KROUPA, and PARIS, *JJ*., agree with this majority opinion.

---

778 (quoting *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. at 983).

The Court of Appeals did not indicate definitively whether any such temporary regulations would actually trump the Supreme Court's prior judicial construction. This may flow from the possibly unresolved issue of whether legislative history should be considered when applying *Chevron* step one. Compare *Natural Res. Def. Council v. U.S. EPA*, *supra* at 603 ("An examination of the statutory language and its legislative history assists us in this inquiry [*Chevron* step one]".), with *Schneider v. Chertoff*, 450 F.3d 944, 955 n.15 (9th Cir. 2006) ("Although we cannot consider legislative history under the first prong of *Chevron*, * * * we note that the Secretary's regulation subverts the very intent of the Nursing Relief Act."). In any event, we will not speculate as to the precise meaning of the Court of Appeals' statement, particularly when, as in this case, we are not bound by that court's caselaw because this case is not appealable, absent stipulation to the contrary, to that court. See *Golsen v. Commissioner*, 54 T.C. at 757.

GUSTAFSON and MORRISON, *JJ.*, did not participate in the consideration of this opinion.

————————————

COHEN, *J.*, concurring: I concur in the result in this case. I would reach the same result, however, on narrower grounds relating to motions to vacate and reconsider or untimely motions to amend pleadings. Moreover, I would adopt petitioner's distinction of *Alioto v. Commissioner*, T.C. Memo. 2008–185, emphasizing the difference between congressional action there and what occurred here.

I would defer discussion of the difficult and divisive issues regarding retroactive regulations, temporary regulations promulgated without notice and an opportunity for comment, and the degree of deference to which these regulations and Treasury regulations generally are entitled. Many cases to be decided in the future, including those now on appeal, will necessarily present those issues. This petitioner should not bear the burden of relitigating this case on a playing field unilaterally redesigned by the adverse party after petitioner has prevailed at this level.

GALE, THORNTON, and MARVEL, *JJ.*, agree with this concurring opinion.

————————————

HALPERN and HOLMES, *JJ.*, concurring in the result only:

I. *Introduction*

Respondent asks that, "in the interests of justice", we vacate our order and decision so that we may reconsider our opinion "to correct a substantial error of law" resulting from the "unusual circumstance" of the Secretary's issuing temporary regulations ostensibly overruling the authority on which we relied 23 days earlier in deciding this case.[1] Understandably, petitioner cries foul, arguing first and foremost that respondent cannot meet the high standards established by this Court for granting either a motion to vacate, see *Taylor v. Commissioner*, T.C. Memo. 1987–403, or a

---

[1] The temporary regulations in question (the temporary regulations) are secs. 301.6229(c)(2)–1T and 301.6501(e)–1T, Temporary Proced. & Admin. Regs., 74 Fed. Reg. 49322 (Sept. 28, 2009).

motion to reconsider, see *Estate of Quick v. Commissioner*, 110 T.C. 440, 441 (1998). The majority finds no reason to resolve the merits of that argument, however, because, it says, even if it were to deny the motions on that ground, respondent might appeal our decision and, "[b]y neglecting the temporary regulations at this time[,] we would not be protecting the integrity of the judicial system * * * but merely failing to fully complete our work." Majority op. p. 217. The majority then proceeds to hold that the temporary regulations are both prospective (and therefore inapplicable to this case) and, because they are unambiguously in conflict with the statute, invalid. Principles of judicial restraint counsel against making unnecessarily broad pronouncements when a case can be fully resolved on a narrower ground. Cf. *Greater New Orleans Broad. Association, Inc. v. United States*, 527 U.S. 173, 184 (1999) (discussing constitutional interpretation). Moreover, by discrediting the substance of the temporary regulations themselves, the majority has assured petitioner a trip to a Court of Appeals that he might avoid were we simply to stamp the motions denied or to dispose of them on grounds particular to this case, as Judge Cohen suggests.[2]

Since the majority has chosen to address the effective date of the temporary regulations and their substantive validity, we feel compelled to comment. We are persuaded by neither of the majority's analyses and would, before addressing any aspect of substantive validity, consider first the logically prior question of the procedural validity of the temporary regulations. With respect to that question, we believe that petitioner has the better argument.

## II. *Applicability of the Temporary Regulations*

The majority concludes: "The plain meaning of the effective/applicability date provisions indicates that the temporary regulations do not apply to this case." Majority op. p. 218. In fact, the temporary regulations provide: "The rules of this section apply to taxable years with respect to which the applicable period for assessing tax did not expire before Sep-

---

[2] In its haste to protect the integrity of the judicial system and to fully complete its work, the majority "question[s]" petitioner's attempts to distinguish *Alioto v. Commissioner*, T.C. Memo. 2008–185, but it does not stop to explain or to resolve those questions. Majority op. p. 217.

tember 24, 2009." Secs. 301.6229(c)(2)–1T(b), 301.6501(e)–1T(b), Temporary Proced. & Admin. Regs., 74 Fed. Reg. 49322, 49323 (Sept. 28, 2009). The relevant dates are as follows:

| | |
|---|---|
| Tax year | 1999 |
| Return filed | Sept. 15, 2000 |
| FPAA mailed | Sept. 14, 2006 |
| Petition filed | Dec. 4, 2006 |
| Order/decision | Sept. 1, 2009 |
| Temp. regs. effective date | Sept. 24, 2009 |

Section 6229(a) provides that, except as otherwise provided in the section, the period of limitations for making assessments with respect to partnership items is 3 years. Section 6229(c)(2) substitutes 6 years for 3 years in the case of a substantial omission of income. The period for making assessments—whether 3 years or 6 years—is suspended by the mailing of an FPAA until our decision in the case becomes final (or, if no petition is filed, the period to petition expires) and for 1 year thereafter. See sec. 6229(d). Because of respondent's motion to vacate order and decision, our decision in this case has not yet become final.

The majority claims: "The plain meaning of the temporary regulations' effective/applicability date provisions indicates that the temporary regulations do not apply to this case because the applicable period of limitations expired before September 24, 2009." Majority op. p. 220. According to respondent, the applicable period of limitations did not expire before September 24, 2009, because, as a result of the temporary regulations, "the applicable period for assessing tax" is the 6-year period prescribed by section 6229(c)(2), which 6-year period had not run on September 14, 2006, when the FPAA was mailed. The filing of the petition then suspended the running of that 6-year period to and beyond September 24, 2009. The majority counters: "We concluded in our September 1, 2009, opinion [which antedates the September 24, 2009, temporary regulations] that the general 3-year limitations period of section 6501(a) was the applicable period for assessing tax in this case and that it had expired some time before September 14, 2006." Majority op. p. 218. It adds: "The plain meaning of the effective/applicability date provisions indicates that the temporary regulations do not apply to this case." Majority op. p. 218.

Since the temporary regulations do not define the term "applicable period for assessing tax" (by stating whether the regulation itself is to be taken into account in determining the applicable period), the meaning of the term is less than plain, so it must be construed. What ground is there, then, for the majority to conclude that the effective date language of the temporary regulations precludes their application to this case? In other words, how can it construe the expression "the applicable period for assessing tax" to mean "the 3-year period for assessing tax"? Perhaps the majority has in mind section 7805(b), as applicable to the temporary regulations. [3] As so applicable, the section reads:

SEC. 7805(b). RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect. [Sec. 7805(b) (pre-1996).]

We have said: "Under section 7805(b) [pre-1996], there is a presumption that every regulation will operate retroactively, unless the Secretary specifies otherwise." *UnionBanCal Corp. v. Commissioner*, 113 T.C. 309, 327 (1999), affd. 305 F.3d 976 (9th Cir. 2002). Here, undoubtedly, the Secretary did specify something with respect to the retroactivity (applicability) of the temporary regulations; viz, the rules therein "apply to taxable years with respect to which the applicable period for assessing tax did not expire before September 24, 2009." Secs. 301.6229(c)(2)–1T(b), 301.6501(e)–1T(b), Temporary Proced. & Admin. Regs., *supra*. Perhaps the majority believes that the Secretary drafted the temporary regulations intending to limit retroactivity to taxable years for which the 3-year period of limitations had not expired on September 24, 2009, but he (unlike the majority) realizes that that meaning is less than plain and now has changed his mind and is taking advantage of his lack of clarity to pull a fast one.

---

[3] In 1996, sec. 7805(b) was amended by the Taxpayer Bill of Rights 2, Pub. L. 104–168, sec. 1101(a), 110 Stat. 1468 (1996), to limit the retroactive application of Treasury tax regulations. The 1996 amendment is effective with respect to regulations that relate to statutory provisions enacted on or after July 30, 1996. See *id.* sec. 1101(b), 110 Stat. 1469. The parties seem to agree (and the majority does not dispute) that the 1996 amendment does not apply to the temporary regulations since the statutory provisions in question, secs. 6229(c)(2) and 6501(e)(1)(A), were enacted before that date. Sec. 301.6229(c)(2)–1T, Temporary Proced. & Admin. Regs., *supra*, was issued under the authority of both secs. 6230(k) and 7805, while sec. 301.6501(e)–1T, Temporary Proced. & Admin. Regs., *supra*, was issued solely under the authority of sec. 7805. T.D. 9466, 74 Fed. Reg. 49322.

There is of course no evidence to support that dubious theory. We believe that the Secretary meant the temporary regulations to apply if either the 3-year or 6-year period of limitations were open on September 24, 2009, but that he was inartful in saying so. Such a reading is supported by IRS Chief Counsel Notice CC–2010–010 (Nov. 23, 2009), which, in relevant part, states:

The temporary regulations apply to taxable years with respect to which the applicable period of limitations for assessing tax did not expire before September 24, 2009. *Accordingly, the temporary regulations apply to any docketed Tax Court case in which the period of limitations under sections 6229(c)(2) and 6501(e)(1)(A), as interpreted in the temporary regulations, did not expire with respect to the tax year at issue, before September 24, 2009, and in which no final decision has been entered.* [Emphasis added.]

If that is what the Secretary meant, then what ground can there be for the majority to conclude that the temporary regulations do not apply to this case because "the applicable period for assessing tax" was a 3-year period that expired before September 24, 2009? The possibilities appear to be that the majority believes either that (1) the Secretary has no authority under any circumstance to overrule the Supreme Court's interpretation of a statute (which implicates the Supreme Court's decision in *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. 967 (2005)), (2) the Secretary has no authority retroactively to overrule the Supreme Court (also implicating *Brand X*), or (3) even if he does have those authorities, under the so-called law of the case doctrine, we need not acknowledge the temporary regulations in this case. If the majority believes any of those things, then it should explain itself. If not, then it should abandon its effective date analysis (which the majority itself describes only as "a plausible ground to rule against respondent's motions", majority op. p. 220) and address petitioner's well-founded argument that respondent cannot satisfy the high standards established by this Court for granting either a motion to vacate or a motion to reconsider or simply ground its decision on its reason (which we question) for finding the temporary regulations invalid.

III. *The Deference Muddle*

In *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767, 778 (9th Cir. 2009), affg. 128 T.C. 207 (2007), the Ninth Circuit acknowledged that the Supreme Court in *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), had

rejected the same interpretation the IRS is proposing in this case. The IRS may have the authority to promulgate a reasonable reinterpretation of an ambiguous provision of the tax code, even if its interpretation runs contrary to the Supreme Court's "opinion as to the best reading" of the provision. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005); *accord Swallows Holding, Ltd. v. Comm'r*, 515 F.3d 162, 170 (3d Cir. 2008). We do not.

We think this is a signal that courts should be especially careful about not deferring to new regulations that address this old problem. Instead, the majority engages in a fullblown analysis of the substantive validity of the regulations even after concluding they do not apply because the regulations are prospective only. The analysis has three parts:

• Sidestepping the longrunning issue of whether Treasury regulations are entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984), *Nat. Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472 (1979), or merely *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944);

• an assertion that *Chevron* step one allows, and perhaps requires, consideration of legislative history in determining "whether Congress has directly spoken to the precise question at issue", *Chevron*, 467 U.S. at 842–843; and

• an analysis of the additional question we have to answer after *Brand X*, 545 U.S. at 984: Did the Supreme Court hold in *Colony* that its interpretation of the key phrase "omits from gross income an amount properly includible therein" is "the only permissible reading" of the statute?

We agree with the majority that it is wise for us as a trial court to avoid the issue of what level of deference to give this regulation. See *Swallows Holding, Ltd. v. Commissioner*, 126 T.C. 96, 180–181 (2006) (Holmes, J., dissenting) (listing circuit conflicts), vacated and remanded 515 F.3d 162 (3d Cir. 2008) (holding regulations entitled to *Chevron* deference).

We are particularly cautious about the majority's possible reliance on *Rodriguez de Quijas v. Shearson/Am. Express,*

*Inc.*, 490 U.S. 477 (1989), see majority op. note 14, as an additional justification for invalidating the regulations. We agree of course that "the Supreme Court has advised lower courts that 'if a precedent of this Court * * * has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the * * * [lower courts] should follow the case which directly controls". See majority op. note 14. But this rule, which the Ninth Circuit alluded to in *Bakersfield*, is not what is at issue here. It is not our Court, but the Secretary, who is reaching a different conclusion about the phrase "omits from gross income an amount properly includible therein". The validity of the regulation after *Brand X* cannot depend entirely on whether prior caselaw conflicts with a later regulation. As the Tenth Circuit recently reasoned: "When a court tentatively resolves an ambiguity in a statute that an agency is empowered to administer, such a resolution carries the force of law until an agency issues a definitive interpretation of the kind that would ordinarily warrant *Chevron* deference." *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1246 (10th Cir. 2008) (upholding regulation contrary to Supreme Court decision after applying *Brand X*). We simply can't reasonably assert, a quarter-century after *Chevron* and, now, after *Brand X*, that "courts have traditionally determined the meaning of statutes," majority op. note 12, if by that we mean that an agency with regulatory power cannot definitively resolve ambiguous statutory language. [4]

We think that the problems of how to use legislative history in a *Chevron* analysis and the effect of *Brand X* on reinterpreting old Supreme Court tax cases are both much more complicated than the majority lets on.

### A.

The *Chevron* test seems quite simple. Step one: Determine "whether Congress has directly spoken to the precise question at issue." *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. at 842. If so, stop. Step two: If Congress has not directly spoken to the question or if what it has said

---

[4] *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1246 (10th Cir. 2008), seems to be the first case to test *Brand X*'s effect on Supreme Court precedent. But we ought not to simply state that we take no position on the question in one footnote, majority op. note 15, while seeming to assert the contrary view in another, majority op. note 14.

is ambiguous, then determine if the agency's interpretation is "based on a permissible construction of the statute." *Id.* at 843.

But *Chevron*'s simplicity ends there.[5]

We focus first on the use of legislative history in *Chevron* step one: *Chevron* tells lower courts to use the "traditional tools of statutory construction" to determine if Congress has spoken on the precise issue. *Id.* at 843 n.9. But how does Congress "speak"? Is it only in the enacted language and its context within a statute, or does it include committee reports, floor speeches, staff-prepared material, and postenactment commentary in later Congresses? And if courts are directed to employ legislative history, when can they do so—only if the text is ambiguous; only if it shows congressional intent clearly contrary to the plain meaning of the text; or whenever it would be helpful in figuring out the meaning, or maybe the purpose, of the act?

These are far-from-settled issues. As other courts have noted, the Supreme Court itself has sent what seem to be mixed signals:

• No consideration at step one—*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. ___, ___, 129 S. Ct. 2458, 2469 (2009) (implying the statutory text is how Congress speaks directly on an issue); *Natl. R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 417 (1992) (comparing the agency's construction only to the statutory text at step one); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("If the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute." (citing *United States v. Boyle*, 469 U.S. 241, 246 n.4 (1985)));

• consideration only if the text is unclear—*Zuni Pub. Sch. Dist. No. 89 v. Dept. of Educ.*, 550 U.S. 81, 93 (2007) ("if the intent of Congress is clear and unambiguously expressed by

[5] Commentators have not been kind to judges. See, e.g., Sunstein, "*Chevron* Step Zero", 92 Va. L. Rev. 187, 221 (2006) (caselaw in "chaos"); Eskridge & Baer, "The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from *Chevron* to *Hamdan*", 96 Geo. L.J. 1083, 1157 (2008) (caselaw "a mess"); Hickman, "A Problem of Remedy: Responding to Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements", 76 Geo. Wash. L. Rev. 1153, 1200 (2008) (Hickman, "A Problem of Remedy") ("a mess"); Beermann, "End the Failed *Chevron* Experiment Now: How *Chevron* Has Failed and Why It Can and Should Be Overruled", 42 Conn. L. Rev. 779, 808 (2010) ("confusing"); Murphy, "Judicial Deference, Agency Commitment, and Force of Law", 66 Ohio St. L.J. 1013, 1022 (2005) (a "confusing mess").

the statutory language at issue, that would be the end of our analysis."); *Dept. of HUD v. Rucker*, 535 U.S. 125, 132 (2002) ("reference to legislative history is inappropriate when the text of the statute is unambiguous"); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999) (declining to consider legislative history when text was clear);

• legislative history used at step one as a traditional tool— *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 130–155 (2000); *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697–699 (1991); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 649–650 (1990).

There are even a fair number of cases that make it difficult to discern whether the Court is consulting legislative history at step one or step two.[6]

The majority does acknowledge this difficulty, but discerns a recent trend toward using legislative history in some way in step one, majority op. note 18. We think the matter is less clear. Here's the current circuit court breakdown:

• First Circuit—*Perez-Olivo v. Chavez*, 394 F.3d 45, 50 n.2 (1st Cir. 2005) (okay in step one "merely * * * to confirm that it does not resolve the [statutory] ambiguity"); *Succar v. Ashcroft*, 394 F.3d 8, 22–23 (1st Cir. 2005) (okay in step one);

• Second Circuit—*Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 122–124 (2d Cir. 2007) (noting reluctance to rely on legislative history in step one, but then doing it);

• Third Circuit—*United States v. Geiser*, 527 F.3d 288, 293 (3d Cir. 2008) (excludes legislative history in step one);

• Fourth Circuit—Compare *Dominion Res., Inc. v. United States*, 219 F.3d 359, 365 (4th Cir. 2000) (okay in step one), and *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 162 (4th Cir. 1998) (same), affd. 529 U.S. 120 (2000), with *Granutec, Inc. v. Shalala*, 46 U.S.P.Q.2d 1398, 1404 (4th Cir. 1998) (unpublished decision) (only in step two);

---

[6] As numerous commentators have concluded, the application of *Chevron* has developed not necessarily in a consistent direction. See, e.g., *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131 (1985) ("our review is limited to the question whether it is reasonable, in light of the language, policies, and legislative history of the Act"); *Chem. Manufacturers Association v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 126 (1985) ("we conclude that the statutory language does not foreclose the agency's view of the statute. We should defer to that view unless the legislative history or the purpose and structure of the statute clearly reveal a contrary intent on the part of Congress."). See generally *Coke v. Long Island Care at Home, Ltd.*, 376 F.3d 118, 127–129 (2d Cir. 2004) (describing the problem and considering legislative history in both steps, but "without attaching primacy" in step one), vacated 546 U.S. 1147 (2006).

• Fifth Circuit—*Sierra Club v. U.S. FWS*, 245 F.3d 434, 443 n.51 (5th Cir. 2001) (okay in step one (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987)));

• Sixth Circuit—Compare *Johnson City Med. Ctr. v. United States*, 999 F.2d 973, 976 (6th Cir. 1993) (okay in step one even if statute is clear), with *Alliance for Cmty. Media v. FCC*, 529 F.3d 763, 778 (6th Cir. 2008) (consider in step two);

• Seventh Circuit—Compare *Univ. of Chi. Hosps. v. United States*, 545 F.3d 564, 569 (7th Cir. 2008) (refusing to consider legislative history after finding statute unambiguous), with *Khan v. United States*, 548 F.3d 549, 556 (7th Cir. 2008) ("we proceed to *Chevron*'s second step. * * * In this step, we can take into account extrinsic sources such as legislative history.");

• Eighth Circuit—Compare *Ark. AFL–CIO v. FCC*, 11 F.3d 1430, 1440 (8th Cir. 1993) (allows legislative history in step one, but only if intent is not clear from the statute's plain language), with *Mayo Found. for Med. Educ. & Research v. United States*, 568 F.3d 675, 681–682 (8th Cir. 2009) (considering legislative history in step two);

• Ninth Circuit—Compare *Natural Res. Def. Council, Inc. v. U.S. EPA*, 526 F.3d 591, 603 (9th Cir. 2008) (considering legislative history in step one), with *Schneider v. Chertoff*, 450 F.3d 944, 955 n.15 (9th Cir. 2006) (courts cannot consider legislative history in step one);

• Tenth Circuit—*Anderson v. U.S. DOL*, 422 F.3d 1155, 1180 (10th Cir. 2005) (okay in step one); *Cliffs Synfuel Corp. v. Norton*, 291 F.3d 1250, 1257 (10th Cir. 2002) (same); *Utah v. Babbitt*, 53 F.3d 1145, 1148 (10th Cir. 1995) (same);

• Eleventh Circuit—*Guar. Fin. Servs., Inc. v. Ryan*, 928 F.2d 994, 1003–1004 (11th Cir. 1991) (use in step one after finding statute ambiguous);

• D.C. Circuit—*Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008) (legislative history okay in step one even to create ambiguity); *Am. Bankers Association v. Natl. Credit Union Admin.*, 271 F.3d 262, 267 (D.C. Cir. 2001) (same); *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1126–1127 (D.C. Cir. 1995) (same); and

• Federal Circuit—*Amber-Messick v. United States*, 483 F.3d 1316, 1323–1324 (Fed. Cir. 2007) (used in both steps);

*Star-Glo Associates, LP v. United States*, 414 F.3d 1349, 1356 (Fed. Cir. 2005) (used in step one).

B.

The fundamental problem in this area—and it's not one that we as a trial court can possibly solve on our own—is that legislative history is a "traditional tool of statutory interpretation" most commonly used when the language of a statute is ambiguous on some point. But if the language of a statute is ambiguous, *Chevron* tells us to read that ambiguity as a delegation of authority to fill the resulting gap with a regulation. Looked at this way, *Colony*'s resort to legislative history in the first place shows a gap that the Secretary is ipso facto allowed to fill. If so, then the Supreme Court's sentence "it cannot be said that the language is unambiguous", *Colony, Inc. v. Commissioner*, 357 U.S. at 33, triggered not only that Court's own look at legislative history, but the authority of the Secretary to issue the regulation we have before us.

One way to read the many decisions using legislative history in step one of *Chevron* is as another check on agency discretion—another way of finding a lack of ambiguity in congressional intent. But the confusion in this area becomes a muddle when one adds in the analysis of whether a pre-*Brand X* precedent that uses legislative history is an analysis that, under *Brand X*, precludes the choice made by the agency in a regulation. Pay particular attention to the passage from *Brand X* that the majority quotes, majority op. p. 221: "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from *the unambiguous terms of the statute* and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added).

It is at least possible that the emphasized language is a direction to lower courts to distinguish pre-*Brand X* precedents that resorted to legislative history from those that relied on plain-language analysis as a way of distinguishing between precedents that allow for their own regulatory supersession from those that do not. It would suggest in this

case the Supreme Court's use of legislative history in *Colony* would not trump an agency construction.

Consider *AARP v. EEOC*, 390 F. Supp. 2d 437 (E.D. Penn. 2005), affd. on other grounds 489 F.3d 558 (3d Cir. 2007). In an earlier case, the Third Circuit held that the Age Discrimination in Employment Act banned treating retirees who were eligible for Medicare differently from those who were not in providing health benefits. See *Erie County Retirees Association v. County of Erie*, 220 F.3d 193 (3d Cir. 2000). The Court carefully reviewed the legislative history to reach its conclusion. See *id.* at 205–208.

Then out popped a contrary regulation from the EEOC. The District Court judge faced with the regulation-vs.-precedent question reasoned that

> *Brand X* clarified the *Chevron* standard itself. In applying *Chevron*'s first step to the regulation at issue in *Brand X*, the Supreme Court did not ask merely whether Congress had "spoken to the precise question at issue," *Chevron*, 467 U.S. at 843, * * * but rather "whether *the statute's plain terms* 'directly address the precise question at issue.'" *Brand X*, 125 S.Ct. at 2702 * * * [*AARP v. EEOC*, 390 F. Supp. 2d at 445.]

The District Court then analyzed the pre-regulation precedent on point, and concluded that "Like its arguments from legislative history, the * * * [Third Circuit's] appeals to general congressional intent and the balancing of competing policy considerations would seem unnecessary if its decision were the only permissible construction of the statute." *Id.* at 450 n.10; see also, e.g., *Mayo Found. for Med. Educ. & Research v. United States*, 503 F. Supp. 2d 1164, 1174 (D. Minn. 2007) (drawing similar distinction in light of *Brand X*), revd. 568 F.3d 675 (8th Cir. 2009).

*AARP* is certainly not the last possible word on this subject. There may well be a distinction between using legislative history to supply the *meaning* of a particular word or phrase and using legislative history to discern the purpose or goal of the statute in which Congress placed that word or phrase so as to be able to best construe it in a particular case. Judge Easterbrook, in his landmark taxonomy on uses of legislative history, *In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989), suggested that legislative history may be used as a dictionary of sorts—to determine Congress's objective rather than subjective intent. *Id.* at 1343 ("'we ask, not what

this man meant, but what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used.'" (quoting Holmes, "The Theory of Legal Interpretation", 12 Harv. L. Rev. 417, 417–419 (1899))). Seen in this light, legislative history should be used to discover the statute's "original meaning", rather than the intent of the individual congressman. *Id.* at 1343 ("An opinion poll revealing the wishes of Congress would not translate to legal rules").

Used in this way, legislative history in step one may present fewer problems. Rereading *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), with this distinction in mind might lead one to conclude that the Court was using legislative history to discern the best reading of ambiguous statutory language in light of the specific problems its drafters had in mind. See *id.* at 33–35. If so, the holding of *Colony* is not that "omission" necessarily means "omission of a particular item", but only that that's the best reading until and unless a regulation clarifying the admitted ambiguity of "omits from gross income an amount properly includible therein" is validly issued.

Few courts have explicitly considered and employed this possible distinction, and we would not necessarily advocate its use here. The conclusion we would draw is simply that the rules for reexamining precedents after *Brand X* are quite uncertain. We don't believe it is beyond the capability of the Tax Court to address such issues with the necessary subtlety, but the majority doesn't even try.

We won't try either, since we prefer to climb onto firmer ground.

## IV. *Procedural Validity of the Temporary Regulations*

That firmer ground, and the reason we are able to concur in our colleagues' result, is that these regulations are procedurally invalid under the Administrative Procedure Act (APA), 5 U.S.C.A. secs. 551–559, 701–706 (West 2007 & Supp. 2009), as amended by the Patient Protection & Affordable Care Act, Pub. L. 111–148, sec. 6402, 124 Stat. 756 (2010), which governs rulemaking even by the Secretary.

The APA requires agencies to publish contemplated rules to allow the public to make comments on their content and

effect. 5 U.S.C. sec. 553(b) and (c) (2006). To ensure measured, informed rulemaking, the agency is then required to take those comments into consideration before promulgating a final rule. *Id.* sec. 553(c). The publication of the rule must occur "not less than 30 days before its effective date". *Id.* sec. 553(d). The agency must also provide "reference to the legal authority under which the rule is proposed". *Id.* sec. 553(b)(2). And these minimum requirements may be modified or superseded only if Congress does so expressly. *Id.* sec. 559.

In the case of these regulations, the Secretary stated his legal authority for the rules—the section 6501(e) regulation was issued under section 7805 and the section 6229 regulation was issued under sections 7805 and 6230(k). The Secretary didn't publish the regulations 30 days before their effective date, but respondent argues—and the majority essentially concedes—that the Secretary's power to make retroactive rules under section 7805(b) (pre-1996) applies. But the Secretary did not seek comments before publishing these temporary regulations, nor did he claim good cause for skipping this step. [7]

Respondent first argues that the APA itself excuses his failure to put the regulations through notice and comment. The Administrative Procedure Act, 5 U.S.C. section 553(b), provides:

this subsection does not apply—

  (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice * * *

The APA provides similar exemptions from the prepublication requirement. *Id.* sec. 553(d).

Respondent does not rely on any argument that these regulations are mere statements of policy or rules of Treasury's organization, procedure, or practice. For the regulations to be valid, then, we must find they are interpretive rules, or we have to accept respondent's alternative argument that

---

[7] When Treasury regulation drafters find good cause to skip notice and comment, Internal Revenue Manual pt. 32.1.5.4.7.5.1(4) (Aug. 11, 2004) directs them to include the following text in the regulations: "'These regulations are necessary to provide taxpayers with immediate guidance. Accordingly, good cause is found for dispensing with notice and public comment pursuant to 5 U.S.C. 553(b) and (c)'". This thin a justification might or might not work, but it is absent from these regulations or the related Treasury Decision. See T.D. 9466, 74 Fed. Reg. 49321 (Sept. 28, 2009). Respondent concedes in his reply brief that he is not relying on this exception.

Congress waived the APA's notice-and-comment requirement for temporary tax regulations.

A. *The Interpretive Exception*

The Treasury Decision containing the regulations, without claiming a particular exception,[8] states: "It also has been determined that section 553(b) of the * * * [APA] does not apply to these regulations." T.D. 9466, 74 Fed. Reg. 49321, 49322 (Sept. 28, 2009). Respondent argues this is because these regulations are interpretive rules (as opposed to legislative or substantive rules), merely clarifying the phrase "omitted from gross income" without changing existing law. Respondent also argues that these regulations are interpretive because they were issued pursuant to the general grant of authority in section 7805 rather than under a specific grant of authority directing the Secretary to issue a regulation with specified content.

The Tax Court often labels as "interpretive" those regulations that the Secretary issues under the general authority of section 7805(a), in contrast to "legislative" regulations, by which we and other tax specialists mean those regulations issued under a more specific authority from Congress.[9]

But "interpretive" means something different in administrative law. Berg, "Judicial Deference to Tax Regulations: A Reconsideration in Light of *National Cable*, *Swallows Holding*, and Other Developments", 61 Tax Law. 481, 486–487 (2008) ("the Administrative Procedure Act (APA) draws the line between legislative and other regulations differently [than tax law]." (fn. ref. omitted)). In administrative law, "interpretive" is a label reserved for regulations that "advise the public of the agency's construction of the statutes and rules which it administers." Clark, U.S. Dept. of Justice,

[8] The Treasury Decision does say that the regulations contain a "reasonable interpretation" of the statutory provisions. T.D. 9466, 74 Fed. Reg. 49321, 49322 (Sept. 28, 2009). Perhaps this was the Secretary's attempt to claim the interpretive exception, but it makes little difference as the APA doesn't require an explicit assertion of the interpretive-rule exception.

[9] Even by this bright-line rule, however, the applicable regulation isn't clearly interpretive in the tax-law sense. Though the parties refer to the two regulations in tandem, section 6229 governs partnerships, meaning that the regulation applicable here is section 301.6229(c)(2)–1T, Temporary Proced. & Admin. Regs. See majority op. note 2. This regulation was issued under two sources of authority—section 7805 and 6230(k). The tax-law definition of interpretive has largely been limited to regulations issued solely under section 7805. See Asimow, "Public Participation in the Adoption of Temporary Tax Regulations", 44 Tax Law. 343, 358 (1991); see also Berg, "Judicial Deference to Tax Regulations: A Reconsideration in Light of *National Cable*, *Swallows Holding*, and Other Developments", 61 Tax Law. 481, 485–486 (2008).

Attorney General's Manual *on the* Administrative Procedure Act 39 (1947), available at http://www.law.fsu.edu/library/ admin/1947cover.html (providing working definitions). [10] Substantive or legislative rules, on the other hand, are "rules, other than organizational or procedural * * * issued by an agency pursuant to statutory authority and which implement the statute * * *. Such rules have the force and effect of law." *Id.*; see also *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (and cases cited). In other words, legislative rules are those that are binding. *Chrysler Corp. v. Brown*, 441 U.S. 281, 301–302 & n.31 (1979); Hickman, "Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance With Administrative Procedure Act Rulemaking Requirements", 82 Notre Dame L. Rev. 1727, 1762–1763 (2007) (Hickman, "Coloring Outside the Lines"); Merrill & Watts, "Agency Rules With the Force of Law: The Original Convention", 116 Harv. L. Rev. 467, 476–477 (2002).

Courts have applied various tests to distinguish between legislative and interpretive rules, but the D.C. Circuit's test in *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993), has become the "dominant standard". Hickman, "Coloring Outside the Lines", *supra* at 1766; see also 1 Pierce, Administrative Law Treatise, sec. 6.4, at 454 (5th ed. 2010) (citing adoption of the test in six circuits including the Tenth and D.C. Circuits). [11] *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d at 1109, relying on both caselaw and the Attorney General's Manual, held that a rule is legislative if Congress has given the agency authority to issue rules with the force of law and the agency intended to use that authority. The court listed four ways an agency could show it intended to issue legislative rules:

---

[10] Though the Attorney General's Manual is not a source of binding law, its definitions are useful as near-contemporaneous constructions of the APA. See *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 218 (1988) (Scalia, J., concurring) (referring to the Attorney General's Manual as "the Government's own most authoritative interpretation of the APA * * * which we have repeatedly given great weight", citing examples).

[11] See *Warder v. Shalala*, 149 F.3d 73 (1st Cir. 1998); *Mission Group Kan., Inc. v. Riley*, 146 F.3d 775 (10th Cir. 1998); *Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934 (D.C. Cir. 1998); *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156 (D.C. Cir. 1997); *Appalachian States Low-Level Radioactive Waste Commn. v. O'Leary*, 93 F.3d 103 (3d Cir. 1996); *Hoctor v. USDA*, 82 F.3d 165 (7th Cir. 1996); *Chen Zhou Chai v. Carroll*, 48 F.3d 1331 (4th Cir. 1995); *N.Y. City Employees' Ret. Sys. v. SEC*, 45 F.3d 7 (2d Cir. 1995).

(1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule. [*Id.* at 1112.]

These four ways of finding agency intent have developed over time. A subsequent case in the D.C. Circuit rejected the second way, calling publication in the CFR merely a "snippet of evidence of agency intent", and rejecting a claim that rules were legislative based on publication alone.[12] *Health Ins. Association of Am., Inc. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994). The Ninth Circuit added a look into whether a rule binds "tribunals outside the agency." *Erringer v. Thompson*, 371 F.3d 625, 631 (9th Cir. 2004) (citing *Hemp Indus. Association v. Drug Enforcement Admin.*, 333 F.3d 1082, 1088 (9th Cir. 2003)). Other cases have relied upon a criterion discussed but not applied in *American Mining*—that if an agency issues a rule interpreting a legislative rule, the underlying legislative rule cannot be too vague or open-ended to support the interpretation. See, e.g., *Gonzales v. Oregon*, 546 U.S. 243 (2006).

Though *American Mining*'s test is not universally accepted, the case reconciles the precedents well and is accepted by at least two of the three potential appellate courts here. See, e.g., *U.S. Telecomm. Association v. FCC*, 400 F.3d 29, 34–35 (D.C. Cir. 2005); *Mission Group Kan., Inc. v. Riley*, 146 F.3d 775, 784 (10th Cir. 1998).[13]

---

[12] One scholar noted that it was common for some agencies to publish any rule with "legal effect" in the CFR (and recognized this phrase was broader than the "force of law"), and that the court didn't want to discourage this practice because it is beneficial to the public. 1 Pierce, Administrative Law Treatise, sec. 6.4, at 453 (5th ed. 2010).

[13] The Eighth Circuit addressed the characterization of interpretive versus legislative rules in *Drake v. Honeywell, Inc.*, 797 F.2d 603 (8th Cir. 1986). In a brief discussion, it appeared to adopt a similar approach of looking to the agency's intent and whether the agency had a delegation of law-making authority. *Id.* at 607–608. Similarly, in *Nw. Natl. Bank v. U.S. Dept. of the Treasury*, 917 F.2d 1111, 1116–1117 (8th Cir. 1990), the Eighth Circuit relied on the familiar distinction that an interpretive rule merely reminds parties of existing duties while a legislative rule "'has the force of law, and creates new law or imposes new rights or duties.'"

But in *Howard E. Clendenen, Inc. v. Commissioner*, 207 F.3d 1071, 1074 (8th Cir. 2000), affg. T.C. Memo. 1998–318, the Eighth Circuit may have held that regulations that the Secretary issued without specific authority do not have the force of law, though it did refer to them as law, see *id.* ("Congress considered then-existing law—namely, Section 402(e)(3), together with its regulations"), and appeared to give them legal effect, *id.* at 1075 (citing the regulations for its conclusions without further sources).

### 1. *Does the Secretary Have Authority To Issue Rules With the Force of Law?*

*American Mining* asks first whether a particular agency has the authority to issue rules having the force of law. The Secretary does—Congress delegated authority to him in various Code sections to create rules and regulations. Section 7805(a) contains the broadest of these delegations, allowing promulgation of "all needful rules and regulations for the enforcement of this title". ("[T]his title" in section 7805(a) refers the entire Internal Revenue Code.) Such regulations carry the force of law, because the Code imposes penalties for failing to follow them. Sec. 6662(b); see also Merrill & Watts, *supra* at 477.

And it is also obvious that the regulations in this case, if valid, would bind both respondent and petitioner. We have held that both temporary and final regulations have the force of law, and we give both the same weight. See *Schaefer v. Commissioner*, 105 T.C. 227, 229 (1995). Both temporary and final regulations give rise to penalties. Sec. 6662(b); sec. 1.6662–3(b)(2), Income Tax Regs.; Hickman, "Coloring Outside the Lines", *supra* at 1738–1739. And both general- and specific-authority regulations also give rise to penalties, so the Secretary's issuance of these regulations under section 7805 makes no difference. Hickman, "Coloring Outside the Lines", *supra* at 1762–1763 ("Regulations that bind both the government and regulated parties are legislative, whether promulgated pursuant to specific or general statutory authority." (citing *Shalala v. Guernsey Meml. Hosp.*, 514 U.S. 87, 99 (1995), and several other sources)).

We would therefore conclude that both section 7805(a) and the various more specific Code sections delegate legislative authority to the Secretary.

### 2. *Did the Secretary Intend To Issue Regulations With the Force of Law?*

The second part of the *American Mining* test asks whether the agency intended the regulations to have the force of law. If we go through *American Mining*'s list of the specific ways an agency can show it intends a rule to have the force of law, we find that two are present here. The first is the Secretary's invocation of his general authority to issue regulations,

plainly noted in the Treasury Decision containing the regulations themselves. Respondent claims that the regulations are interpretive under the APA, but the Secretary's cited source of authority doesn't quite match that sentiment—he promulgated one of these regulations explicitly under section 7805 alone and the other under both section 7805 and section 6230(k), knowing that regulations issued under these sections carry the force of law.

The second is that these regulations effectively changed (or at least tried to change) existing law. *American Mining* phrased this factor as amending "a prior legislative rule." This leads to another question left unanswered and unaddressed by the majority: Does *Brand X* require an agency's interpretation to be embodied in a legislative rather than an interpretive rule to trump an existing judicial interpretation? Even assuming an agency interpretation can displace the Supreme Court's, see *Hernandez-Carrera v. Carlson*, 547 F.3d 1237 (10th Cir. 2008), we think the answer must be yes, in part because when there is otherwise binding judicial precedent, an agency interpretation asserting a contrary interpretation amounts to a change in the law.[14] Certainly, as the Ninth Circuit recognized in *Bakersfield*, 568 F.3d at 768, 778, a Supreme Court decision such as *Colony* binds lower courts at least until something changes. Respondent wants us to vacate our otherwise final decision, which he could not logically ask us to do without implying that the Secretary intended that these new rules have the force of law.

But we don't need to puzzle this out. *American Mining* tells us: "If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule." *Am. Mining*, 995 F.2d at 1112. So even if our reasoning on this second way of finding agency intent is wrong, it remains true that the Secretary explicitly invoked his legislative authority in promulgating these regulations and Congress entrusted him with that power. That makes them legislative.

---

[14] The *Brand X* framework also suggests this result. In *Brand X*, the Court weighed a prior judicial interpretation against "an agency construction otherwise entitled to *Chevron* deference". *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). Just 5 years earlier, the Court said interpretive rules—those lacking the force of law—aren't entitled to *Chevron* deference. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). It seems to follow that if an agency wants to trump judicial precedent, it has to issue legislative rules.

Thus, although the regulations may be "interpretive" according to the common usage in the sense that they set forth respondent's interpretation of the underlying statutes, and "interpretive" according to tax-law usage in the sense that one of them was issued under section 7805 alone, they are not "interpretive" under the APA's exception to the notice-and-comment requirements because they are meant to bind the public, which the Secretary has the power to do. [15]

B. *Section 7805(e) and the APA*

Though the Secretary did not subject the regulations to notice and comment, he did issue identical proposed regulations and a Notice of Proposed Rulemaking (NPRM) at the same time as the temporary regulations, as required by section 7805(e)(1). This section directs the Secretary, when issuing temporary regulations, to issue a simultaneous NPRM and sets a 3-year expiration date for all temporary regulations. The legislative history of that section, respondent says, shows that Congress was aware of the Secretary's procedures of issuing temporary regulations that were effective immediately but without notice and comment. [16] He says that Congress implicitly okayed that process by limiting the temporary regulations to 3 years and ensuring that the Secretary issued an NPRM at the same time. Even though this violates the APA, he justifies it by arguing that section 7805(e) conflicts with the APA, and in the battle of the statutes, a specific statute trumps a general one. See *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961).

We do not agree. First we note that nothing in the text of the statute suggests that the notice-and-comment requirement has been waived, nor does the legislative history state that it has. The legislative history does note that the Sec-

---

[15] Nearly 30 years ago, in *Wing v. Commissioner*, 81 T.C. 17, 28 (1983), we mentioned that Treasury regulations, though deemed to have the force of law, still qualify as "interpretative" rules and are exempt from the APA's requirements. In context, this was dictum, and the overwhelming weight of precedent from later years counsels us not to follow it.

[16] Prior law had allowed temporary regulations to linger for a very long time, to the point that courts were beginning to notice a pattern of the Secretary's growing reliance on temporary regulations without ever finalizing or repealing them. See, e.g., *Fleming v. Commissioner*, T.C. Memo. 2010–60 (relying on 25-year-old temporary regulations for substantiation standards). Several commentators suggest that Congress was actually aiming to restrict the Treasury's regulation writers by curtailing this practice. See Hickman, "A Problem of Remedy," *supra* at 1209; ABA, Section of Taxation, "Report of the Task Force on Judicial Deference", 57 Tax Law. 717, 735 (2004); Asimow, *supra* at 363–364.

retary commonly issued temporary regulations with imme-diate effect, but this alone hardly suggests Congress meant to waive notice and comment for all temporary regulations.[17] The legislative history does not even mention the APA, and both the Supreme Court and the APA itself provide that exceptions to the APA's terms cannot be inferred—much less inferred from an absence in the legislative history:

> Recognizing the importance of maintaining a uniform approach to judicial review of administrative action * * * we have closely examined the * * * claim for an exception to that uniformity. * * * [Congress has specified] in the APA that "no subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly." 5 USC § 559. * * * The APA was meant to bring uniformity to a field full of variation and diversity. * * * [*Dickinson v. Zurko*, 527 U.S. 150, 154–155 (1999).]

Respondent may think that section 7805(e) makes him spe-cial when it comes to rulemaking, but the APA makes it clear that he is not.

Giving the public the opportunity to participate through notice and comment is important in giving regulations legit-imacy. See *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001); *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Chrysler Corp. v. Brown*, 441 U.S. at 316; see also Hickman, "A Problem of Remedy: Responding to Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements", 76 Geo. Wash. L. Rev. 1153, 1201 (2008) (Hickman, "A Problem of Remedy") ("The APA and its notice-and-comment rulemaking procedures reflect congressional goals of simultaneously facilitating government rulemaking and protecting individual rights through public participation."); *id.* at 1204 ("While perhaps less than ideal, the APA notice-and-comment process, coupled with judicial review of the agency's adherence to that process, serves as a second-best proxy for the legislative process when Treasury or any other agency seeks to bind the public with regulations having the force and effect of the statutes they purport to interpret.").

---

[17] Though issuing a simultaneous NPRM and seeking post-effective comments is consistent with respondent's argument, Congress may have intended this to apply only to temporary regu-lations that already fit into an exception to the APA, especially considering that a need for tem-porary regulations would normally be expected in emergency or good-cause situations.

Giving the public a chance to comment only after making the regulations effective does not comply with the APA. See, e.g., *Chrysler Corp. v. Brown*, 441 U.S. at 315; *Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005) ("It is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later."). And courts invalidate even final regulations when an agency does this.[18] See, e.g., *U.S. Steel Corp. v. U.S. EPA*, 595 F.2d 207, 214–215 (5th Cir. 1979). But see *Fed. Express Corp. v. Mineta*, 373 F.3d 112 (D.C. Cir. 2004).

Because these regulations were issued under sections 6230(k) and/or 7805, they are binding and legislative as a matter of administrative law. We would therefore invalidate them on procedural grounds for failure to comply with the APA.

A court should not entirely ignore invalidated regulations—but we cannot give them binding force.[19] See *Chrysler Corp. v. Brown*, 441 U.S. at 313 ("regulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act"); Hickman, "A Problem of Remedy", *supra* at 1197 n.199 (suggesting invalidated regulations may be similar in force to proposed regulations, which set forth the agency's views but do not bind courts). Respondent's problem here is that we have already considered his position in other cases, and we have rejected it. *Bakersfield Energy Partners, LP v. Commissioner*, 128 T.C. 207 (2007); *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, T.C. Memo. 2009–195. He needs to have new regulations that *do* have binding force.

---

[18] Respondent does point to some cases where temporary regulations were relied upon despite not undergoing notice and comment, see *UnionBanCal Corp. v. Commissioner*, 305 F.3d 976 (9th Cir. 2002), affg. 113 T.C. 309 (1999); *Kikalos v. Commissioner*, 190 F.3d 791 (7th Cir. 1999), revg. T.C. Memo. 1998–92, but in these cases APA compliance wasn't challenged. We also note, as we did in *UnionBanCal Corp. v. Commissioner*, 113 T.C. at 317 n.8, that the Secretary asserted a good-cause exception to the APA's notice-and-comment requirement when he issued the regulations in these cases. T.D. 8168, 52 Fed. Reg. 48407 (Dec. 22, 1987) (*Kikalos*); T.D. 7991, 49 Fed. Reg. 46992 (Nov. 30, 1984) (*UnionBanCal*).

[19] If respondent had successfully promulgated interpretive rules, we would reach this same point.

These don't, and we therefore see no compelling reason to vacate our decision in *Intermountain*. For that reason, we concur with the majority's result.